190 So.2d 244 (1966)
The TEXAS PIPE LINE COMPANY
v.
Harry STEIN and Mrs. Leona Falgoust Stein.
No. 2243.
Court of Appeal of Louisiana, Fourth Circuit.
July 15, 1966.
Rehearing Denied October 5, 1966.
Writ Granted November 18, 1966.
*246 Wiley G. Lastrapes, Daniel P. Hurley, New Orleans, Blum & Sotile, Donaldsonville, Milling, Saal, Saunders, Benson & Woodward, M. Truman Woodward, Jr., R. King Milling, New Orleans, for plaintiff-appellant.
Martin, Himel & Peytavin, Lloyd R. Himel, Lutcher, for defendants-appellees.
Before REGAN, YARRUT and BARNETTE, JJ.
BARNETTE, Judge.
This expropriation suit comes to us on appeal from a judgment in favor of defendants Harry Stein and Mrs. Leona Falgoust Stein, owners of the property in question. Plaintiff-appellant has accurately stated the factual background to the suit substantially as follows:
Plaintiff, a common carrier pipeline company, sought a permanent servitude 30 feet wide as a right-of-way for its proposed pipeline along the northern boundary of defendants' property, a tract of approximately 825 acres situated on the east bank of the Mississippi River near the Sunshine Bridge in St. James Parish. The proposed 30-foot servitude extends along the northern edge of the property for approximately 1,530 feet and contains 1.06 acres. After traversing that distance, the pipeline would turn north and enter property owned by Texaco, Inc., on which a refinery is located where the line will terminate.
Plaintiff sought an additional temporary servitude to use for construction purposes which would be 30 feet wide on the landward *247 side of the levee and 120 feet wide on the river side of the levee.
Plaintiff operates several common carrier pipelines, including one which runs from fields in southeast Louisiana, near Houma, to two refineries at Port Arthur, Texas. Texaco is a principal user of this line, but it also serves other, smaller producers of crude oil and liquid hydrocarbons. Because the existing line is operating at maximum capacity, and because of increased consumer demand for petroleum products, Texaco decided to build a new refinery at Union, Louisiana, and contracted with plaintiff to use a proposed pipeline to run from the Houma fields the 40-mile distance to the refinery site. Plaintiff designed and selected a route for an 18-inch pipeline with an initial daily capacity of 130,000 barrels. The capacity could be increased to 300,000 barrels daily by providing additional pumping equipment. The servitude plaintiff seeks in this suit is the final link between the oil fields and the refinery.
Since the pipeline was to cross the Mississippi River, it was necessary to get approval of the crossing plans from the United States Army Corps of Engineers. The Corps of Engineers refused to approve any crossing that was not essentially perpendicular to the flow of the river. This insistence on the shortest possible crossing made it necessary for plaintiff to cross either the property of the defendants or the property immediately adjacent thereto on the north, identified as the James property.
When negotiations with the property owners were unsuccessful, plaintiff filed this suit to expropriate a right-of-way.
Defendants filed an exception of vagueness or ambiguity, an exception of no cause of action and no right of action, and an exception to the jurisdiction. The exception to jurisdiction is predicated on defendants' contentions that LSA-R.S. 45:251-45:265[1] are in violation of Article 1, Section 2[2] and Article 4, Section 15[3] of the Constitution of Louisiana and that the property sought is not needed for public purposes. By stipulation the exception of vagueness or ambiguity was waived in its entirety; and a hearing on the exception of no right and no cause of action and the exception to jurisdiction was waived, and the subject matter of those exceptions referred to the merits. Another exception of no right or cause of action was filed at the conclusion of trial predicated on the contention that plaintiff had failed to offer or file in evidence "a certificate of necessity from the office of Petroleum Administration for defense, a federal agency, or a certificate of public convenience or necessity from any federal or state agency."
Defendants' answer denied that the right-of-way sought was the most direct or suitable route for plaintiff's pipeline; that other property or route was available to it and there was no necessity for the taking of their property. They alleged further that plaintiff was not in good faith and had abused discretion in laying out the route of its pipeline. In the event of a taking, they sought compensation for the land, for crop damage, and for consequential and severance damage in an amount far in excess of the amounts offered by plaintiff. Defendants further asserted in their answer that plaintiff is not a public utility and is a private carrier, not a common *248 carrier; that the proposed pipeline would serve no public purpose; and that plaintiff was not entitled to expropriate the land. The case was tried on these and other incidental issues.
The trial court's judgment rejected plaintiff's demands, dismissed its petition, and fixed and taxed as costs witness fees for three expert witnesses called by defendants. Plaintiff has appealed.
The trial court, basing its judgment primarily on the authority of River & Rail Terminals, Inc. v. Louisiana Ry. & Nav. Co., 171 La. 223, 130 So. 337 (1930), held that the proposed pipeline would not serve a public purpose. The judge said in his reasons for judgment:
"From the record as a whole, the Court can only conclude as a factual matter that at the present time the sole and only purpose of the proposed pipe line is to carry crude products to one point and one point only, namely, the refinery of Texaco presently being constructed at Union, Louisiana. The Court is further of the opinion that as a legal proposition, the taking, under our constitution and jurisprudence, must be one for a public purpose and that the transportation of crude resources to one company's plant for refinery is not such a public purpose. The fact that the plaintiff pipe line would, as testified to by Mr. Evans, accept shipments from others to any plant which may be constructed by others, or the fact that the products to be manufactured by Texaco will find their way to the public, does not alter the situation. The Court does not believe that a potential public use is synonymous with the term public purpose as used in our constitution, and accordingly, finds this defense to be valid."
Thus the court held that the constitutional requirements for expropriation of private property had not been met. None of the other issues raised by the pleadings were reached.
Defendants-appellees have filed a motion to dismiss the appeal and, with reservation of rights under that motion, have answered the appeal. They pray that in the event the trial court should be reversed on the single issue upon which its judgment rests that the case be remanded for the determination by the district court of all other issues. In the alternative they pray for denial of plaintiff's right to expropriate defendants' property for lack of good faith and abuse of discretion in the selection of a route across defendants' property. Further in the alternative they pray, in the event the right-of-way in question is expropriated, that compensation, crop damage, consequential and severance damage, and expert witness fees be fixed in amounts aggregating approximately $99,000.
We must first dispose of the motion to dismiss the appeal which was argued and submitted with the issues on the merits. The motion is predicated on the allegation that since the rendition of the judgment below an alternate route for crossing the Mississippi River has become available to plaintiff which we will hereafter refer to as the angular crossing, or Location "B". It is alleged that the United States Corps of Engineers will now issue a permit for this crossing, which it had previously refused; that, therefore, the taking of defendants' property is not necessary; and that the questions presented by this appeal are now moot. To this motion to dismiss they have annexed copies of certain letters and documents indicating that plaintiff did renew its application for the angular crossing directly onto property owned by Texaco where the new refinery is under construction. It appears from the correspondence that the renewed application for angular crossing might meet favorable consideration under certain strict requirements, but permission has not been granted.
Appellant admits in answer to the motion to dismiss the appeal that it renewed *249 its application for an angular crossing because of the extreme pressures of time and possible tremendous financial loss if it is left without a river crossing. It contends that the angular crossing would be far more expensive and would entail many more serious engineering problems than the crossing sought in this proceeding. Its answer is supported by affidavits.
Under the exhibits and affidavits before us, the most that can be said of appellees' contention is that the issues in question might become moot if the angular crossing permit were actually issued. Counsel for defendants-appellees have said in their brief that they have been unable to find any decisions of the appellate courts of Louisiana on the question here presented. Appellant has cited G.E.M. Sundries Co., Inc. v. Johnson & Johnson, Inc., 269 F.2d 908 (9th Cir. 1959), holding that a court will not dismiss an appeal for "prospective mootness." But for a more obvious reason we think the motion is without merit. The issue of the alleged bad faith and abuse of discretion by plaintiff in selecting the route across defendants' property as opposed to plaintiff's contention that the route selection meets all requirements of the law as set forth in our jurisprudence renders the question anything but moot. Furthermore the issues raised by the appeal before us are of wide public concern and of vital interest to the oil and gas industry and the economy of the State of Louisiana, as evidenced by the filing herein of amicus curiae briefs by the Attorney General of the State of Louisiana and 28 law firms from all sections of the State. All the issues raised here by the motion to dismiss the appeal appear to have been raised and decided against dismissal in Ohio Oil Co. v. Fowler, 232 Miss. 694, 100 So.2d 128 (1958).
The law favors appeals and except for clear and substantial cause the discretion of the appellate court should be exercised against dismissal for technical reasons. Emmons v. Agricultural Ins. Co., 245 La. 411, 158 So.2d 594 (1963); Spiller v. Spiller, 170 La. 813, 129 So. 212 (1930); Sam v. Deville Gin, Inc., 143 So.2d 838 (La.App. 3d Cir. 1962). The motion to dismiss the appeal is overruled.
This brings us to the issues raised by the appeal and answer. They are:
1. The right of plaintiff pipeline company to expropriate private property under the facts presented in this case.
2. The necessity and right of expropriation of that portion of defendants' property selected by plaintiff for pipeline right-of-way.
3. The value of the land in question and the compensation to be paid defendants, in event of a taking, for the servitude and temporary work area.
4. The amount of crop damage.
5. The consequential or severance damage to the remainder of defendants' property.
6. The expert witness fees taxable as costs.
We must disagree with the trial judge in his conclusion that plaintiff has failed to prove that the proposed pipeline would serve a public purpose. The distinction between this case and River & Rail Terminals, Inc. v. Louisiana Ry. & Nav. Co., supra, is so clearly evident to us that we do not find there the supporting authority which the trial judge found in it. Furthermore, we find error in the trial judge's reasons for judgment where he found that, since the pipeline would serve only one consumer (the Texaco, Inc., refinery under construction at Union) when placed in operation, it would therefore be for a private purpose.
There is abundant evidence in the record to establish beyond question that plaintiff is a common carrier petroleum pipeline authorized to do business in the State of Louisiana under the regulatory authority of the Louisiana Public Service *250 Commission. See LSA-R.S. 45:251, 45:252. Nor do defendants contend that plaintiff does not enjoy the right to expropriate private property under the authority of LSA-R.S. 45:254. Defendants' contention is that in the instant case plaintiff fails to meet the test of public purpose, which, counsel argues, means, in the absence of a specific constitutional qualification, actual public use, and that, accordingly, the constitutional requirement for the taking of private property has not been met.
We must reject defendants' argument on the ground that the evidence clearly shows that the pipeline in question meets the test of public purpose and that "actual public use" is not the criteria by which public purpose is determined.
The facts are that the pipeline when completed will transport crude petroleum, crude petroleum products, distillates, condensates, liquefied petroleum gas, and liquid hydrocarbons for hire from a point near Houma, Louisiana, where these products are gathered through feeder lines from 21 oil fields in South Louisiana, from over 5,000 royalty and mineral interest owners for refining into consumable products at the Texaco, Inc., refinery at Union, Louisiana. This transmission will be controlled by the State through the regulatory powers of the Louisiana Public Service Commission, which, among other things, insures nondiscriminatory tariff rates and acceptance into the line of any oil produced along the route. Furthermore, if any producer should want to use it for shipment of his crude petroleum to some outlet other than the Texaco Refinery, such as a barge terminal on the Mississippi River, he would be free to do so at the fixed tariff rates. There can be no requirement that shipment be only to Texaco's refinery.
Defendants point to LSA-R.S. 45:259 which provides in part as follows:
"* * * When there shall be offered for transportation more petroleum than can be transported immediately, it shall be equitably and ratably apportioned. The commission shall make and enforce general or specific regulations in this regard. Subject to these provisions, pipe lines shall accept ratably and equitably for transporation all marketable petroleum tendered; but no common carrier pipe line shall at any time be required to receive for shipment from any person, in excess of three thousand barrels of petroleum in any one day."
From this they argue "that even a common carrier can discriminate as to quantity when the tender exceeds only three thousand barrels of petroleum in any one day." The reason for this restriction is obvious. It is to protect the public right to use the pipeline by preventing a monopoly being acquired by one or a few producers. Rather than supporting defendants' attack upon the public character of the pipeline, we think it has the opposite implication.
Initially, the pipeline will be capable of carrying a greater amount of crude petroleum than that required by Texacoenough to insure ample facility to take care of foreseeable public needs. It is designed for expansion as the needs of the industry may require. At present there are no agreements to receive into the line petroleum products from any other source than the point of origin near Houma. Since pipeline transportation is much cheaper and more practical than shipment by truck, it is contemplated that the Thibodaux field, which is now shipping by truck to Houma for entry into plaintiff's pipeline there for transportation to Texas, will be serviced by this pipeline since it passes through that area of production. This probability is more likely since the line to Texas has already reached its maximum capacity. The use of the line to those producers on a nondiscriminatory basis is insured by our law. That this use is potential rather than actual does not make the pipeline any less a common carrier serving a public purpose, *251 since the right of the public to use it without discrimination is assured.
It could hardly be argued seriously that a pipeline which distributed a product such as natural gas or fuel oil to 5,800 consumers in the general public from a single point of production would not be serving a public purpose. We can see no valid distinction between a distributing pipeline and one which serves 5,800 private producers, members of the general public, by transporting their crude product to a single refinery where it is converted into a consumable product. The only difference is the direction of the movement of the commodity through the pipeline.
Much has been said in the briefs of counsel about "public policy," and defendants point to the failure of Louisiana to write into its constitution a specific expression of public policy regarding certain industries and resources, as other states have done. From this it is argued that the stringent restrictions of Article 1, Section 2 and Article 4, Section 15 have not been relaxed. We fail to see the point of this argument, since the ultimate purpose of this litigation is to protect the defendants by requiring a judicial determination of whether the constitutional principles have been met in applying LSA-R.S. 45:251-45:265 to the factual situation of this case.
The tremendous public benefits derived from the petroleum industry in the State of Louisiana are too well-known to warrant discussion. Perhaps no other resource is more important to the State's economy, and the public carrier pipelines which serve that industry are public utilities without which this all-important industry could not have been developed to its present significance. The public advantage resulting from an enlargement of the resources of the State, increasing available industrial energy and promoting the productive powers of a considerable number of citizens, was recognized by our Supreme Court as a contribution to the welfare and prosperity of the community, and was held to be sufficient proof of public purpose to justify the taking of private property by expropriation. Calcasieu & So. Ry. v. Bel, 224 La. 269, 69 So.2d 40 (1953).
The Bel case involved the taking of private property for a spur track from a main line of a railroad to a privately owned sand and gravel pit. The plaintiff railway and the gravel pit were owned by the same parent company, a relationship closely analogous to that existing here between Texaco, Inc., and The Texas Pipe Line Company. The primary purpose in building the spur track was to serve the gravel and sand pit owned by plaintiff. It was shown that upon completion of the spur it would be open to the use of any persons for shipment of freight. The Court distinguished that case from River & Rail Terminals, Inc. v. Louisiana, Ry. & Nav. Co., supra, and held that a public purpose was shown and the taking would be for purposes of public utility. Certainly no less public advantage would result from the completion of the pipeline in this case.
The important distinction between the Bel case and the River & Rail case is the fact that in the lattera suit in trespass brought against the defendant railroad which had surreptitiously built a spur track across plaintiff's 40-foot wide parcel of propertythe spur led from the main track to a private industry; and there was no possible way for it to serve the public. The Court there said:
"The evidence clearly shows that the spur track of defendant company serves no other enterprise but the New Orleans Refining Company, and that it was constructed solely for the purpose of enabling defendant company to handle tank cars shipped out by the refinery.
"There is nothing in the record to show that the public has ever used the spur track of defendant company, or that defendant company's spur track will accommodate *252 a number of plants on the river front, and will be open to all other business enterprises, present and future, in the same vicinity. The evidence fails to establish, in our opinion, that the entire public has the right to use the spur track, constructed by defendant company to the plant of the New Orleans Refining Company.
"It is well settled that there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public. [Citations omitted.]" 171 La. at 232, 233, 130 So. at 340.
We think the Bel case is much more pertinent to the factual situation in the instant case and will follow the authority of that opinion. See also Interstate Oil Pipe Line Co. v. Friedman, 137 So.2d 700 (La.App.3d Cir. 1962), and Louisiana Power & Light Co. v. Charpentier, 165 So.2d 614 (La.App. 1st Cir. 1964).
In his reasons for judgment, the trial judge quoted at length from United Gas Pipe Line Co. v. Blanchard, 149 So.2d 615 (La.App. 1st Cir. 1963). It was factually established there that gas service had been available for five years for both domestic and commercial consumers, including the two consumers proposed to be served by a new pipeline. The court held that plaintiff had failed to prove public demand or necessity. The Blanchard case was held inapplicable by the same court in the Charpentier case on a factual distinction which is equally fitting here.
The public purpose is no less served because the pipeline initially will deliver to only one consumer. If this were reason to reject its qualification as a public utility carrier, it would be very difficult, if not impossible, for any new common carrier pipeline for delivery of crude oil to a refinery to qualify, for we may fairly assume they are initially connected to only one refinery. It is not the number of persons who initially contract for use of the line, nor the number who might actually use it at any given time, which determines its public character, but rather the extent of the right to its use by the public. City of New Orleans v. New Orleans Land Co., 173 La. 71, 136 So. 91 (1931); Kansas City, S. & G. Ry. v. Louisiana W. R. R., 116 La. 178, 40 So. 627 (1905); Gulf States Util. Co. v. Callahan, 65 So.2d 608 (La.App. 1st Cir. 1953); Chicago G. W. Ry. Co. v. Jesse, 249 Minn. 324, 82 N.W.2d 227 (1957); Dotson v. Atchison, T. & S. F. Ry., 81 Kan. 816, 106 P. 1045 (1910); State ex rel. Ami Co. v. Superior Court, 42 Wash. 675, 85 P. 669 (1906); 2 Nichols, Eminent Domain § 7.2(1) (3d ed. 1963); 26 Am.Jur.2d, Eminent Domain § 31 (1966).
Defendants alternatively plead in the event of reversal of the trial court on the issue of the right of plaintiff to expropriation, which was the only issue decided below, the case be remanded for decision of all the remaining issues by the trial court. They do recognize, however, the authority of this court to adjudicate all issues, and we are not impressed by the argument why we should not do so.
This is a matter of great importance and public concern as we have pointed out above. There is a tremendous investment involved in plaintiff's pipeline and a multimillion-dollar refinery nearing completion dependent upon this pipeline for its crude petroleum. The ends of justice would be served by the exercise of our authority to render final judgment on all issues if the record before us is complete enough to do so.
Before considering the remaining issues, it will be helpful to have before us a map of the general area in question. We have prepared and reproduced below a sketch of that section of the Mississippi River and abutting property from exhibits on file in the record. We have omitted from this *253 sketch many notations and markings not necessary to the purpose here intended. We make no claim to cartographical perfection.

*254 For further clarification we reproduce below a map identified as Exhibit A and annexed to plaintiff's petition which shows accurately on larger scale the exact location of the proposed permanent right-of-way and the temporary construction right-of-way.

We now address ourselves to the necessity for the taking of the specific property sought by plaintiff and defendants' contention that the selection was arbitrary and an *255 abuse of discretion since other suitable routes are available. This very issue was raised and the fundamental concepts which must be applied in resolving it were fully discussed in Central Louisiana Elec. Co., Inc. v. Covington & St. Tammany Land & Improvement Co., 131 So.2d 369 (La.App. 1st Cir. 1961).
Here the defendants contend that plaintiff was arbitrary and abused discretion in that it should and could have located its west bank terminus from which the river crossing was to be made at a point farther upstream, directly across from the Texaco Refinery. They further contend that an angular crossing could be made from the Ewen property, entering the Texaco property at some point north of the James property, thus avoiding crossing any private property on the east bank. This is the route identified as Location "B" on the above map. (Figure 1.)
Mr. Robert J. Evans, a graduate licensed civil engineer and an executive of the plaintiff company, testified concerning the methods and procedures employed in locating the route of the pipeline in question. It would serve no good purpose to attempt to summarize the detailed procedures to which he testified. Suffice it to say that they were almost identical to those used by the engineers in Texas Eastern Transmission Corp. v. Bowie Lumber Co., 176 So.2d 735 (La.App. 1st Cir. 1965), and in Central Louisiana Elec. Co., Inc. v. Covington & St. Tammany Land & Improvement Co., supra, as described in some detail by the courts in both cases. After the company engineers made their preliminary decisions about the location, direction, and terminal points for the river crossing, plaintiff then employed Pyburn and Odom, a well-known and reputable firm of engineering consultants with extensive knowledge and experience in regard to the Mississippi River in the State of Louisiana. In a detailed report on the proposed river crossing, that firm concurred in the selection made by plaintiff's engineers and recommended as the most desirable crossing the one indicated as Location "A" on the above map. (Figure 1.)
The engineers preferred Location "A" over Location "B" for several reasons. The line of the pipe at Location "A" is much more nearly perpendicular to the flow of the river, as required by the United States Corps of Engineers whenever possible. Being a shorter, more direct crossing it would cost an estimated $40,000 less than a crossing at Location "B". The flow of the current in the river at that point is from the east bank downward toward the west bank and would more likely cause "scouring" of the river bottom at Location "B" than at Location "A". There are troughs in the river bottom of greater depth near the east bank along Location "B". Upkeep would be more costly and repair more likely because of the greater length at Location "B".
Mr. Evans testified as follows:
"A * * * as I stated in previous testimony, when the decision to cross the river where we are now proposing to cross it was made in the early part of the year, and on that basis we then attempted to negotiate with both the James heirs and the Steins, the owners of the Stein property, for the right to cross their property either on one side or the other of the property line separating them. We were not successful in negotiating with either one of them for a right of way, so it was then that we compromised on what we thought was the best engineered crossing and decided to attempt to make an angle crossing across the Mississippi River to the Texaco property in order to avoid litigation with either one of these landowners and to expedite the matter. So on June 11 we applied to the Corps of Engineers for an angle crossing and they advertised it as they do and then we received a letter from the Corps of Engineers *256 on July 7 refusing to grant us an angle crossing across the Mississippi River to the Texaco property and telling us that it would be necessary for the crossing to be approximately ninety degrees (90) with the course of the river. So it was then that we knew that we were going to have to deal with the landowners on the east side of the river and we felt that it was necessary to go onto the Stein property because this was the closest to a ninety degree (90) crossing with the course of the river, as I testified before. So we then attempted again to negotiate and were unsuccessful in that, which has brought about this suit, and then we applied to the Corps of Engineers for a crossing to the Stein property on July 15, of 1965."
The argument that plaintiff might proceed up the west bank to a point opposite the Texaco Refinery and there make a direct crossing cannot prevail. In the first place, we think it has been proven by expert testimony that the crossing at Location "A" meets the test of sound engineering practice. In the second place, this would require taking of other private property involving a number of factors no less important to the property owners on the west bank than those on the east bank. These factors were considered by plaintiff's engineers, and the crossing selected was found to be more feasible.
In Central Louisiana Elec. Co., Inc. v. Covington & St. Tammany Land & Improvement Co., supra, the court said:
"Regarding the general subject matter of expropriation the jurisprudence of this state has evolved certain fundamental concepts and rules which have been repeated on innumerable occasions. One such cardinal principle is that in the location of rights-of-way considerable discretion is vested in the expropriating authority and the courts will not disturb or interfere with the exercise thereof in the absence of fraud, bad faith or conduct or practices amounting to an abuse of the privilege. [Citations omitted.]
"It is also well settled that availability of other and alternate routes is of no concern to the property owner whose land is sought to be expropriated provided the location selected fulfills the needs and requirements of the expropriator, meets the standards prescribed by sound engineering and economic practices, is neither arbitrarily nor capriciously chosen, and does not constitute an abuse of the discretionary right of selection. * * *" 131 So.2d at 375, 376.
The burden of proof is upon the defendants to show that the plaintiff is guilty of fraudulent practices, bad faith, or conduct amounting to an abuse of the privilege of expropriation. Texas Eastern Transmission Corp. v. Bowie Lumber Co., supra.
It is not the court's purpose so much to determine if plaintiff's engineers have exercised their discretion wisely, as if they have done so honestly. There is nothing in the record to indicate that the selection of Location "A" was not made honestly and in keeping with sound engineering practices. The defendants have failed to prove bad faith, fraudulent practice or conduct amounting to an abuse of the privilege of expropriation. Plaintiff is therefore entitled to expropriate the property in question.
With regard to quantum, two real estate appraisers testified for plaintiff and two for defendants. Their respective qualifications are similar and uncontested, and we consider them of equal competence as experts for the appraisal of the land in question. On the matter of compensation for the 1.06 acres taken for the permanent servitude, there is very little difference between the highest and lowest estimate of value. All of the appraisers employed the accepted method of use of comparable sales, *257 and some particular recent sales in the area were relied on by all the experts. The only variation which we consider significant is that Mr. Gerald Van Viator, one of the defendants' appraisers, included certain sales on the west bank of the river which we do not think are as nearly comparable as the sales of property of comparable acreage on the east side of the river. For many reasons the land value on the two sides varies significantly in the same general area.
The estimates of value of the 1.06 acres range from $1,240.20 to $1,606.96, the highest being that of Mr. Viator. Considering that his estimate was based in part on comparables on the west side of the river, we think that the estimate of defendants' other appraiser, Mr. Kermit Williams, $1,358, is more nearly correct. The average of the three lower estimates is slightly more than $1,300. We, therefore, conclude that defendants are entitled to $1,350 for the 1.06 acres, and judgment should be entered accordingly.
Defendants are entitled to the rental value of that portion of their property required for a temporary construction right-of-way, because they will be deprived of its crop value for one year. An amount of $146.95 has been accepted by all the appraisers as reasonable, based on a 6 to 8 percent per annum return on the dollar value of that parcel. Defendants are therefore entitled to judgment for this amount.
The question of an award for damage to existing crops on the land involved in both the permanent and temporary servitudes, while of little consequence when compared with the total investment here involved, has had our serious consideration. Plaintiff's claims and right-of-way agent, Mr. Kenneth H. Woodward, testified to making an offer of $1,116 for this item when he was attempting to negotiate for the servitudes. What plaintiff was willing to pay for this item in the hope of avoiding litigation and costly delay cannot be accepted as an indication of its actual value. The only evidence we find in the record to support this claim is a stipulated agreement that Kermit Coulon, an agricultural expert who had been summoned to testify for defendants, would not be called as a witness, but that if he had testified it would be to the effect that the damage to the sugar cane crop "would not have been more than $900."
It is agreed by all appraisers that the value of the land in question for agricultural purposes is $400 per acre. We find in the record photographs offered as evidence by defendants showing a standing crop of sugar cane. We observe in these photographs that the sugar cane cultivation is only on that portion of the right-of-way which lies east of the state highway which runs parallel to the levee. That portion of the right-of-way which crosses the highway, the levee, and the batture to the mean low water line of the river is not under cultivation. Therefore, the area covered by the sugar cane is considerably less than the whole of the 2.63 acres involved in the permanent and temporary servitudes.
It is incredible that the value of one year's crop of sugar cane is worth approximately twice the total value of the land on which it is grown. Since the only testimony is that the crop is worth "not more than $900" we interpret that to mean also that it could be worth lessbut how much less we have no expert knowledge or testimony on which to base an opinion. Counsel for plaintiff have raised this point in their brief, but they did not offer any testimony at trial to contradict the $900 evaluation, and by their stipulation they waived the right to cross-examine the expert. While the figure is unrealistic, it is the only expert evaluation we have before us, and defendants will be awarded $900 for the crop damage.
The question of severance or consequential damage has given us great concern. The right-of-way will extend along the line between defendants' property and that identified as the James property. The taking *258 of 30 feet from defendants' land along this line will not cut defendants' property into separate tracts, hence there is no severance in the literal meaning of the word. However, in expropriation cases, severance and consequential damages are terms frequently used in the same meaning. The issue of damage here, strictly speaking, is that caused to defendants' remaining property as a consequence of the taking of this servitude for use as a pipeline right-of-way along its northern boundary.
That portion of defendants' property bounded on the south by the Sunshine Bridge right-of-way; a railroad on the east; the pipeline and Texaco property on the north; and the Mississippi River on the west, contains 85.80 acres of agricultural land. The question of consequential damage is limited to this portion of defendants' remaining property.
The distance from the bridge to the pipeline has been estimated by various witnesses as being 1,300 to 1,700 feet. The actual distance from the north line of Section 17 separating the James and Stein tracts to the center of the bridge is 1,705 feet. Therefore, we may reasonably assume that the actual distance between the pipeline and the nearest physical structure of the bridge is approximately 1,600 feet.
It is agreed between the parties that this property would have its highest value as an industrial site, and we have found that value to be $1,300 per acre. The experts are in hopeless disagreement on the consequential damage caused by the pipeline to the industrial value of the 85.80 acres. On the basis of the testimony in the record before us, it is not possible to determine the extent of this damage, but the plaintiff's experts seem to be closer to reality than the defendants' experts. Defendants' appraisers compute the damage at $900 per acre, being the difference between its industrial and its agricultural value. Obviously, this could only be based upon an assumption of total destruction of the industrial value of the property as a result of the location of the pipeline along its northern boundary. This is incredible and is not even entirely supported by their own testimony. On the other hand, plaintiff's appraisers testified that the remaining property will suffer no consequential damage whatever. They do not see the pipeline as being any interference with the industrial use of the 85.80 acres. This testimony is also unrealistic and cannot be accepted. There is no expert testimony in the record between these two extremes from which we can arrive at any conclusion as to the actual damage to the industrial value of the remaining property.
We have the testimony of Mr. Evans for plaintiff and of Captain S. K. Sprada, a licensed "Master of Rivers and First Class Pilot on the Mississippi River," who testified for defendants. As might be expected, Mr. Evans testified from the viewpoint, experience, and technical knowledge of an engineer and Captain Sprada from the viewpoint, experience, and technical knowledge of a river pilot. The engineer sees the pipeline buried in a trench 20 feet below the bottom of the river as posing no actual danger, and as no impediment to navigation, including the anchorage of ocean-going vessels. The river pilot sees the pipeline lying across the river bottom ready to snare any anchor which might be dropped near ita very real danger and a hazard to be avoided by the pilot. There is merit in both views and a substantial amount of testimony was taken to justify each opinion. Without attempting a detailed summary of the testimony, we will state the conclusions we have reached.
We think too much emphasis has been placed on the speculation that the unrestricted docking of ocean-going vessels would be the most important factor considered by a prospective purchaser. In the first place the 1,600-foot river frontage of the 85.80 acres is ample space within which to dock the largest vessels. Captain Sprada did not deny this and admitted ability to dock a sea-going vessel with a 50-foot clearance on each end, as is done at the *259 New Orleans wharves. He did explain the difficulties which would be encountered in anchoring a large vessel under certain conditions near the underwater crossing of the pipeline. The presence on the river bank at each terminus of the crossing of a sign saying "CautionPipeline CrossingDo Not Anchor" according to Captain Sprada would cause a pilot to avoid, if at all possible, dropping anchor within any conceivably unsafe distance. This we can and do accept as a factor to be considered. When questioned how deep an anchor digs into the river bottom he would not hazard a guess. He had no idea whether it could possibly engage a pipeline 20 feet below the river bottom. Mr. Evans testified that this would be physically impossible, and that the signs are required to be posted out of an abundance of caution. We believe the danger may be more psychological than real, but nevertheless it is an interference with the free anchorage of vessels. The psychological danger of pipelines has been recognized by our Supreme Court and considered an element of consequential damage. Texas Pipe Line Co. v. Barbe, 229 La. 191, 85 So.2d 260 (1956); Texas Pipe Line Co. v. National Gasoline Co., 203 La. 787, 14 So.2d 636 (1943). This element of damage was recognized and discussed by us in United Gas Pipe Line Co. v. New Orleans Terminal Co., 156 So.2d 297 (La.App., 1963).
In arriving at the industrial market value of the land in question without the presence of the pipeline, the appraisers must certainly have considered all potential industrial usesits use by industries requiring docking of ocean-going vessels; by those requiring the docking of barges only; by those using both barge and deep sea vessel transportation; by those requiring no water transportation facilities; and many other factors. Any appraisal of the industrial market value with the presence of the pipeline which does not likewise take into consideration all these factors cannot be a sound estimate of value. The wide divergence of conclusions reached by the appraisers makes it evident that they did not consider all these factors in evaluating the land with the pipeline.
We are fully aware of the importance of time to plaintiff and the loss of time that may result by remanding the case for further trial, and have searched the testimony of all the witnesses in vain to find some basis upon which to arrive at a fair and equitable estimate of reduction in the industrial value of the land in question. As stated above, there is no estimate of damage between none and total, both of which we have rejected.
Plaintiff argues, and on good authority, that the burden is on the landowner to prove the damage to his remaining land and that proof must be with legal certainty. This proof must be positive and not based upon speculation and remote possibilities. City of Alexandria v. Jones, 236 La. 612, 108 So.2d 528 (1959); State Through Dept. of Highways v. Tessitore, 178 So.2d 501 (La.App. 1st Cir. 1965); United Gas Pipe Line Co. v. New Orleans Terminal Co., supra; Texas Gas Transmission Corp. v. C. M. Thibodeaux Co., 148 So.2d 337 (La.App. 1st Cir. 1962).
We must hold that the defendants have proved that there will be some consequential damage to a legal certainty, but they have not proved the extent of the damage. Their claim is based upon highly speculative and remote possibilities, conjecture and assumption. We do not believe the ends of justice would be served by granting plaintiff the right to expropriate defendants' land without just compensation, merely because the defendants have failed to prove precisely the extent of the damage. In the absence of some credible estimate of damage upon which we could rest a judgment, any figure which we might assume to be equitable and just would be purely arbitrary.
When an appellate court concludes there are some severance damages, but there is no competent evidence in the record *260 upon which an award can be based, the case should be remanded to give the landowner the opportunity to prove the extent of such damages. Texas Gas Transmission Corp. v. Broussard, 234 La. 751, 101 So.2d 657 (1958); Texas Pipe Line Co. v. Barbe, supra; State Through Dept. of Highways v. Reuter, 175 So.2d 316 (La.App. 4th Cir. 1965); United Gas Pipe Line Co. v. New Orleans Terminal Co., supra.
In State Through Dept. of Highways v. Reuter, supra, this Court considered a problem in computing severance damages similar to that posed by the instant case. The plaintiff Highway Department took the position there was no severance damage due to loss of access, while the defendant based his only estimate of severance damage on a total loss of access. We found there was only a partial loss of access and remanded the case for further testimony on this point, reasoning: "* * * any damage which we might attempt to assess on account of partial loss of access, which we find as a fact to exist, would, obviously, not be supported by any evidence before us."
Texas Pipe Line Co. v. Barbe, supra, involved severance damages to two tracts of land as a result of a pipeline crossing the properties. As in the instant case, the defendants' experts testified that the remaining land was totally destroyed for industrial purposes and that the damages should be the difference between the value of the land for industrial purposes and its value for agricultural purposes; while the plaintiff contended there was no severance damage at all. For one tract, the trial judge awarded defendant the total difference between the market value of the land for industrial and agricultural purposes; and for the second, larger tract, 15 percent of the difference between the market value for industrial and for agricultural purposes. On the first rehearing, the Supreme Court reversed the award for severance damages because it held the expert testimony was conflicting and the damage speculative and remote, the defendants having failed to prove by a preponderance of the evidence that the adjacent land would be damaged by a pipeline right-of-way. On the second rehearing, the Court found there was some severance damage but the award was excessive and the percentage method used by the trial judge was "legally incorrect." However, it reasoned that in the interest of justice the case should be remanded to permit defendants to establish severance damages by competent evidence, the Court concluding:
"* * * To make ourselves perfectly clear, defendants must effectively show the market value of each tract immediately before and immediately after the expropriation in order to establish the quantum of their severance damages." 229 La. at 220, 85 So.2d at 271.
When the Supreme Court termed the percentage method used by the trial court "legally incorrect" we conclude that it did not mean that severance damages could not be computed on the basis of a percentage of loss of market value over an entire tract affected, but rather that there was no evidence in that particular record upon which an accurate percentage could be based. In fact, in Tennessee Gas Transmission Co. v. Primeaux, 100 So.2d 917 (1958), the First Circuit upheld an award based upon a 5 percent decrease in market value over an entire tract and distinguished the Barbe case because it found severance damages were fixed with sufficient legal certainty so that a remand for additional testimony was not necessary. A writ of certiorari was denied by the Supreme Court.
We pretermit the question of taxation of expert witness fees as costs in view of our decision to remand on the issue of consequential damage.
The defendants' exception of no right or cause of action predicated on the contention that plaintiff failed to file in evidence a certificate of necessity has not been argued nor briefed. This is an intrastate *261 pipeline and defendant has not pointed to any federal agency having regulatory authority over it, nor has any failure to comply with state requirements been pointed out to us. We assume this exception has been abandoned, but, if not, it is overruled.
The judgment rejecting plaintiff's right of expropriation of defendants' land, more particularly described in its petition and Exhibit A annexed thereto, and dismissing its petition is reversed. The judgment fixing expert witness fees and taxing same as costs is set aside. The case is remanded for further trial and judgment in accordance with the specific holdings and views herein expressed. The trial on remand shall be limited exclusively to the issue of quantum of consequential damage to defendants' remaining 85.80 acres and the issue of expert witness fees. Judgment shall be rendered by the trial court consistent herewith. Costs of this appeal shall be paid by defendants-appellees, all other costs to await final judgment.
Reversed; remanded with instructions.
NOTES
[1] LSA-R.S. 45:251-45:265 defines petroleum pipelines as common carriers, provides control and regulation by the Louisiana Public Service Commission, grants the right to expropriate private property, and provides certain incidental procedures and penalties.
[2] LSA-Const. Art. 1, § 2 provides that private property shall not be taken or damaged except for public purposes after just and adequate compensation has been paid.
[3] LSA-Const. Art. 4, § 15 provides that no vested rights shall be divested unless for public utility and for just and adequate compensation previously paid.