GUIDRY, Justice.*
| ExxonMobil Pipeline Company (hereinafter, “ExxonMobil”) as a common carrier pipeline company seeks to expropriate land belonging to Union Pacific Railroad Company (hereinafter, “Union Pacific”) for a private, restricted-access, at-grade surface crossing over Union Pacific’s spur track and runaround track in Plaquemine, Louisiana. These tracks are used to service customers Shintech, Air Liquide, and Georgia Gulf. ExxonMobil’s reason for the access route is to facilitate performance of maintenance and federally-mandated testing procedures commencing at a valve assembly located within ExxonMobil’s right of way on property owned by Georgia Gulf. This valve assembly was part of an extension of ExxonMobil’s pipeline to provide ethylene to Shintech. The district court found ExxonMobil failed to show a necessary and public purpose for expropriation of the subject land. The court of appeal majority affirmed. For the reasons set forth below, we reverse the lower courts’ rulings, enter judgment in favor of Exxon-Mobil, and remand the case to the district court for further proceedings.
FACTS AND PROCEDURAL HISTORY
ExxonMobil, as stipulated by the parties, is a common carrier pipe line 12company with the right to expropriate “private property under the state expro *194 priation laws for use in its common carrier pipe line business.[1] La.Rev.Stat. 45:254. In 1979, ExxonMobil constructed an ethylene pipeline extending from LA Hwy 1 in Plaquemine, Louisiana, into what is now the Georgia Gulf plant. In 2007, by adding a valve assembly, ExxonMobil constructed an extension of the pipeline into what is now the Shintech plant. The valve assembly is located approximately 2500 feet from LA Hwy 1 on property owned by Georgia Gulf. ExxonMobil employees testified that federal statutes and regulations require monthly inspection of the valve assembly, bi-annual operation of the valves themselves, and a mechanical inspection every five years. This mechanical inspection consists of the placement of a device referred to as a PIG into the line at the valve assembly and then running the PIG to the end of the line. The PIG is placed into the line at the valve assembly with the use of a cherry picker, weighing approximately 40,000 pounds. Additional equipment is used to flare-off the ethylene removed from the valve assembly during insertion of the PIG.
According to testimony at trial, Exxon-Mobil employees determined that the best access route to the valve assembly would lie from Evergreen Road through Georgia Gulf property, across Georgia Gulfs private outbound track, across Union Pacific’s parallel spur and runaround tracks, and along ExxonMobil’s right of way for the pipeline extension for about 1000 feet east of the valve site. ExxonMobil’s Senior Staff Right of Way and Claims Agent testified that he had immediately ruled out accessing the valve assembly from LA Hwy 1 to the west, because of having to mitigate possible wetland delineations along that route, having to cross or build over | pother pipelines, having to secure rights of way and additional servitudes from four different property owners, having to build crossings over two ditches, and, most importantly, having to build the road or part of it above its own or another company’s pipeline. While a road may cross over a pipeline at a minimum 30-degree angle, the witness explained, the pipeline company does not allow roads to be built alongside and above a pipeline for safety reasons.
ExxonMobil prepared plans, obtained permission for the route from Georgia Gulf crossing its property, and then requested permission from Union Pacific for the 50-by-30-foot section crossing its spur and runaround tracks. ExxonMobil selected the location noting that it appeared there was some build-up at that location allowing informal, if unauthorized, passage over the tracks. At any rate, ExxonMobil employees met at the site with Union Pacific employees, who then rejected the request noting that Union Pacific as a policy matter does not grant new at-grade crossings, even private ones, at least without a corresponding removal of other such crossings. Correspondence ensued, in which Exxon-Mobil offered inter aha to limit its access to monthly inspections and the mechanical inspection every 5 years, to place a locked gate at the crossing, and to provide sufficient notice to Union Pacific whenever a crossing is to be made. Eventually, Exx-onMobil made an offer of money based on its expert’s estimated value of the land to be expropriated. Representatives from both companies met again, this time at an attorney’s office, but the parties could *195 reach no agreement, with ExxonMobil desiring the at-grade surface crossing and Union Pacific refusing it. Thereafter, ExxonMobil petitioned for expropriation of Union Pacific’s property under its authority as a common carrier pipe line company.
Following a bench trial, the district court denied the petition for expropriation. The district court observed that ExxonMo-bil had to establish that the expropriation |4is for a public and necessary purpose. The district court further noted that the pipeline had been constructed and was moving product, so that ExxonMobil was required to show a public purpose for the requested servitude across a railroad track to cross the track and inspect its pipeline. Relying on Texas Pipe Line Company v. Stein, 190 So.2d 244 (La.App. 4th Cir.1966), rev’d on other grounds, 250 La. 1104, 202 So.2d 266 (1967), the district court found the public character of the servitude is determined by the extent of the right to its use by the public. Here, the district court reasoned, ExxonMobil had restricted the right of the public to use the crossing by limiting its use only to ExxonMobil employees. The district court further noted that ExxonMobil had obtained over 9000 feet of servitude for the pipeline extension, along with an additional servitude for a road of 1000 feet. On this reasoning, the district court found Exxon-Mobil had failed to establish a public and necessary purpose for the servitude across Union Pacific’s spur and runaround tracks.
ExxonMobil appealed, and a majority of the court of appeal affirmed the district court’s ruling. ExxonMobil Pipeline Company v. Union Pacific Railroad Company, 08-2347 (La.App. 1 Cir. 5/13/09), 15 So.3d 246. The court of appeal majority found that ExxonMobil had failed to establish a public purpose because the right of the public to use the desired servitude had been restricted by ExxonMobil itself. The court of appeal majority observed that, in determining whether a proposed expropriation is for a public purpose, the courts look to the extent of the public’s right to its , use rather than the number of persons actually using the property at any given time, citing, as did the district court, Texas Pipe Line Company v. Stein, 190 So.2d at 252. The court of appeal majority further noted there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation that may prove beneficial or profitable to some portion of the public, citing Terrebonne Parish Police Jury v. Kelly, 472 So.2d 229, 232 (La.App. 1st Cir.1985), which had cited River & Rail Terminals v. Louisiana Ry. & Nav. Co., 171 La. 223, 130 So. 337, 340 (1930). However, the Court of appeal majority observed, “actual use by the public is not the criteria by which public purpose is determined,” citing Texas Pipe Line Company, 190 So.2d at 250. 08-2347, p. 4, 15 So.3d at 248.
Nonetheless, the court of appeal majority reasoned as follows:
In the instant case, ExxonMobil seeks to expropriate a right of way to build an access road solely to enable it to access its pipeline to perform routine maintenance and inspections. ExxonMobil asserts that the pipeline serves a public purpose and that the access road is necessary to maintain that public purpose. However, the record is devoid of any evidence that the right of way and proposed access road itself will serve a public purpose. In fact, the evidence presented at trial suggests that the portion of the access road crossing Union Pacific’s property will be a private crossing, with a locked gate that will only be accessible by ExxonMobil. Further, according to the record, the access road will only be used by ExxonMobil to ac *196 cess its pipeline at the valve site to perform routine maintenance and inspections. None of this evidence demonstrates, however, that the public has a general right to a definite use of the property.
08-2347, p. 5, 15 So.3d at 249. The majority concluded that the land sought to be expropriated would not itself be used to protect the safety of the public, but rather, would be used only by ExxonMobil to access its pipeline and right of way to perform statutorily-required maintenance and inspections. Thus, the majority found no error in the district court’s finding that ExxonMobil had failed to establish a public and necessary purpose for the expropriation of the right of way and access road servitude across property owned by Union Pacific.
The dissenting judge on the appellate court panel believed that ExxonMobil did not have to prove the public will directly use an access road to establish a public purpose. The dissenting judge reasoned that ExxonMobil did prove a public purpose because it established it needed access to its pipeline to perform inspections and maintenance of the valve site to ensure the integrity and safe operation of the pipeline hand safety of the public. It was sufficient to prove public purpose, the dissenting judge further reasoned, that such maintenance of the pipeline is required by federal statute and that the access road is needed to perform these mandated inspections.
On application by ExxonMobil, we granted the writ application to consider the correctness of the rulings below. ExxonMobil Pipeline Company v. Union Pacific Railroad Company, 09-1629 (La.10/30/09), 21 So.3d 269.
DISCUSSION
The issue before this court is whether ExxonMobil has established a public and necessary purpose for expropriation of a servitude across Union Pacific’s rail tracks for an access road, which ExxonMobil asserts is necessary to perform statutorily-mandated inspections on its pipeline. As previously noted, ExxonMobil is a common carrier pipeline company as defined in La. Rev.Stat. 45:251. La.Rev.Stat. 45:254 thus grants ExxonMobil with the authority to expropriate private property under certain circumstances. That statute provides, in pertinent part:
All persons included in the definition of common carrier pipe lines as set forth in R.S. 45:251 have the right of expropriation with authority to expropriate private property under the state expropriation laws for use in its common carrier pipe line business, and have the right to lay, maintain and operate pipe lines, together with telegraph and telephone lines necessary and incident to the operation of these pipe lines, over private property thus expropriated, and have the further right to lay, maintain and operate pipe lines along, across, over and under any navigable stream or public highway, street, bridge or other public place, and also have the authority, under the right of expropriation herein conferred, to cross railroads, street railways, and other common carrier pipe lines by expropriating property necessary for the crossing under the expropriation laws of this state.
Article I, Section 4 of the Louisiana Constitution of 1974 addresses the expropriation of private property by a private entity for public purposes:
Property shall not be taken or damaged by a private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is *197 public and necessary shall be a | ^judicial question.
Expropriation laws are special and exceptional in character, in derogation of common rights, and as such, must be strictly construed. United Gas Pipe Line Company v. Blanchard, 149 So.2d 615 (La.App. 1st Cir.), writ denied, 244 La. 135, 150 So.2d 590 (1963).
Public Purpose
ExxonMobil argues that its ethylene pipeline supplies petroleum to Shintech, and that by supplying even one consumer, a plant facility that provides jobs and other benefits to the community, the pipeline serves a public and necessary purpose. ExxonMobil further argues that the access road is necessary to perform federally-mandated inspections on the pipeline and that these inspections are intended to protect the safety of the public and ensure the delivery of needed resources to its consumers. Thus, ExxonMobil argues, the access road serves a public and necessary purpose, by allowing ExxonMobile to maintain and inspect its valve site and pipeline.
The lower courts found that the public would be restricted from actual use of the access road itself, and thus the extent of the right of the public to use the access road indicated that it would not serve a public purpose. ExxonMobil argues the lower courts erred in focusing primarily on whether the public would have actual use of the railroad crossing, when the authority granted to ExxonMobil as a common carrier pipeline company is broad enough to include additional real estate to facilitate the maintenance and inspection of its pipeline. Before this court, Union Pacific has downplayed the lower courts’ focus on actual public use of the requested crossing; instead, Union Pacific argues the district court did not only find the lack of a public purpose, it also found that the requested crossing was not shown to serve a necessary purpose.
|RWe find the lower courts erred in focusing primarily upon the actual usage of the public of the desired railroad crossing in determining whether the requested servitude would serve a public purpose. While actual public use of the servitude may play a role in the appropriate case in determining whether the expropriation serves a public purpose, we do not read the constitutional provision and the statutes granting ExxonMobil its authority to expropriate private property as restricting expropriating real estate to that on which the pipeline itself is placed, nor do we interpret these provisions and the jurisprudence as requiring direct public use as the sole factor in determining whether the expropriated property will serve a public purpose.
As the court of appeal majority noted, see 08-2347, p. 7 n. 3, 15 So.3d at 250 n. 3, the courts of this state have taken arguably divergent views on finding a public purpose when a proposed expropriation is alleged to serve only a single, private entity, and thus some courts have focused solely upon whether the public would have the right to actual use. For example, in River & Rail Terminals, Inc. v. Louisiana Ry. & Nav. Co., a railroad laid a spur track across the property of the plaintiff to reach the property of an oil refinery company. The plaintiff accused the railroad of illegal and tortious trespass and sought injunctions prohibiting the railroad from using the track and requiring the track’s removal. Although not an expropriation action, this court stated that “[t]he outstanding issue in this case is whether the spur track in question is for a private or public purpose.” Id., 130 So. at 338. The plaintiff argued that “the spur track was constructed for the private accommodation of both defendant railroad and the oil re *198 finery, and to make the private business of both more profitable.” Id at 339. This court agreed, finding that the public had the right to use neither the refinery’s loading station nor the spur track and that the spur track “serves no other enterprise but the [refinery], and ... was constructed solely for the purpose of enabling |3[the railroad] to handle tank cars shipped out of the refinery.” Id at 340. In so holding, this court stated, “It is well settled that there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public.” Id. at 340.
However, this court later identified the somewhat differing approaches to determining public purpose, quoting Corpus Juris, vol. 20, p. 551 et seq., as follows:
No general definition of what degree of public good will meet the constitutional requirements for a “public use” can be framed, as it is in every case a question of public policy. The meaning of the term is flexible and is not confined to what may constitute a public use at any given time, but in general it may be said to cover a use affecting the public generally, or any number thereof, as distinguished from particular individuals. Some courts ... hold that “public use” is synonymous with “public benefit,” “public utility” or “public advantage,” and to authorize the exercise of the power of eminent domain to promote such public benefit, etc., especially where the interests involved are of considerable magnitude, and it is sought to use the power in order that the natural resources and advantages of a locality may receive the fullest development in view of the general welfare.... Other courts, however, ... hold[ ] in effect that “public use” means use by the public.... Under this view it is essential to constitute a public use that the general public have the right to a definite and fixed use of the property appropriated, not as a mere matter of favor or by permission of the owner, but as a matter of right.... The character of the use, and not its extent, determine the question of public use. It is not essential that the use or benefit extend to the whole public or any considerable portion thereof, nor that each and every individual member of the community have the same degree of interest therein; the fact that the use and benefit is limited to the inhabitants of a small locality, or that the number of persons who are expected to avail themselves thereof is small, is immaterial provided it is open to all upon the same terms.
City of New Orleans v. New Orleans Land Co., 173 La. 71, 136 So. 91, 92-93(1931).
Later jurisprudence from this court and our appellate courts, except for that of the First Circuit, has not followed the arguably more restrictive line set forth in River & Rail Terminals. In Calcasieu & S. Ry. Co. v. Bel, 224 La. 269, 69 So.2d 40, 43 (1953), for example, the plaintiff established that its railroad would serve the public | ¶(¡generally and any industries located near its tracks, and that it hoped to move and transport over its line various commodities, including timber, gravel, and cattle. The plaintiff further established that lumber corporations, owners of large tracts of land situated in the vicinity of the proposed rail line, and purchasers of forest products would and could make use of the facilities of this railroad in the shipment of these products. This court in approving the expropriation, reasoned as follows: “It was shown that the railroad will serve the public, and that the public may use and enjoy its facilities; that the construction of the road will be a public advantage and will tend to enlarge the resources, increase *199 the industrial energies, and promote the productive powers of a considerable number of the inhabitants or businesses of a section of this state, and manifestly will contribute to the general welfare and prosperity of the community in which it is located. Consequently the taking is for public purposes and for purposes of public utility, within the meaning of those terms as they are used in the Constitution.” Id., 69 So.2d at 42-43.
Another example is Dixie Pipeline Co. v. Barry, 227 So.2d 1 (La.App. 3d Cir.1969), writ refused, 255 La. 145, 229 So.2d 731 (1970), in which the Third Circuit acknowledged that a proposed pipeline would connect a privately owned plant with the proposed expropriator’s pipeline, but nonetheless found a public purpose where the plant produced propane from the raw stream it received from area producers and where “the effect of the pipeline will be to transport large quantities of propane gas from the plant to a large market in several states.” Id. at 7. Similarly, in finding a public purpose for a proposed pipeline that connected to a single enterprise in Louisiana Resources v. Greene, 406 So.2d 1360 (La.App. 3d Cir.1981), writ denied, 412 So.2d 84 (La.1982), the Third Circuit held that “[t]he public need not be supplied gas directly from the pipeline for which expropriation is sought for |nthe expropriation to meet the test of public purpose.” Id. at 1364. Rather, “[t]he pipeline serves a public purpose merely by placing more natural gas in the stream of commerce.” Id. See also Texas Pipe Line Co. v. Stein, 190 So.2d at 250 (“ ‘actual public use’ is not the criteria by which public purpose is determined”).
Given the long line of cases since River & Rail Terminals, we agree with the Third Circuit that, despite some previous “restrictive language, the Louisiana jurisprudence has not defined ‘public purpose’ so narrowly.” Town of Vidalia v. Unopened Succession of Ruffin, 95-580 (La.App. 3 Cir. 10/4/95), 663 So.2d 315, 319 (per then Judge Knoll). “Rather, any allocation to a use resulting in advantages to the public at large will suffice to constitute a public purpose.” Id.
Accordingly, applying these precepts to the facts of this ease, we find the servitude across Union Pacific’s spur and runaround tracks would serve a public purpose. Even if the access road, and the private at-grade crossing that is the subject of this litigation, are not directly or actually used or open to the public at large, the road and the servitude do serve a public purpose in that they permit the pipeline company to maintain and inspect its pipeline, which delivers petroleum products to end users, and which redounds in benefits to the public at large. Indeed, we note the rather circular logic of the court of appeal and district court, in that they both reasoned that ExxonMobil’s offer to restrict use of the crossing only to ExxonMobil employees once a month and every five years — to assuage the safety concerns of Union Pacific — was suggestive that the public purpose was not established because the public was not given right of access to the crossing. Even Union Pacific has not made such an argument.
Necessary Purpose
Indeed, Union Pacific’s primary challenge to the expropriation proceeding is |12its claim that ExxonMobil has not separately shown that the at-grade crossing it desires serves a necessary purpose. Union Pacific argues the district court made a factual finding that the desired route sought by ExxonMobil was not necessary, ostensibly because other routes to the valve site were possible. However, we do not interpret the district court’s reasoning *200 as a factual finding that the servitude over the rail tracks did not serve a necessary purpose, and to the extent that the district court may have done so, we find the record evidence does not support such a finding.
In challenges to the necessity of a taking, the landowner must prove that the legislatively-authorized expropriator exercised “its large discretion” arbitrarily, capriciously, or in bad faith. Red River Waterway Com’n v. Fredericks, 566 So.2d 79, 83 (La.1990). Whether the expropriator’s purpose is public and necessary is a judicial determination that will not be reversed on appeal absent manifest error. Calcasieu-Cameron Hosp. Serv. Dist. v. Fontenot, 628 So.2d 75, 78 (La.App. 3d Cir.1993), writ denied, 94-0168 (La.3/18/94), 634 So.2d 854. In the context of expropriation, “necessary” refers to the necessity of the purpose for the expropriation not the necessity for a specific location. Calcasieu-Cameron Hosp. Serv. Dist., 628 So.2d at 78. Once public necessity is established, the extent and the location of property to be expropriated are within the sound discretion of the expropriation authority and determination of same will not be disturbed by the courts if made in good faith. Id.
The criteria to be considered by the expropriator in determining the location and extent of the property to be expropriated includes factors such as costs, environmental impact, long range area planning, and safety considerations. Red River Waterway Com’n, 566 So.2d at 83 (citing U.S. v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946)). The amount of land and the nature of the acreage taken 113must be reasonably necessary for purpose of the expropriation, but it is not necessary “to show actual, immediate, and impending necessity for the expropriation.” City of New Orleans v. Moeglich, 169 La. 1111, 126 So. 675, 677 (1930). The suitability of the property for expropriation is primarily a question of fact on which the judgment of the trial court will not be disturbed unless manifestly erroneous. Board of Com’rs of New Orleans Exhibition Hall v. Missouri Pacific R. Co., 625 So.2d 1070, 1073 (La.App. 4th Cir.1993), writ denied, 93-3088, 93-3100 (La.1/28/94), 630 So.2d 802. By statute, expropriation of property for common carrier pipe line purposes may include “the real estate, rights of way, pipe in line, telephone and telegraph lines or other communication systems, tank facilities ... necessary for the proper conduct of its business as a common carrier, all fixtures, equipment and personal property of every kind owned, controlled, operated, used or managed, in connection with, or to facilitate the transportation, distribution and delivery of petroleum through lines constructed of pipe.” La.Rev.Stat. 45:251(3) (emphasis supplied).
In this case, ExxonMobil’s Senior Staff Right of Way and Claims Agent, Paul Saltaformaggio, testified regarding the necessity of periodic access to the valve assembly for federally-mandated inspection and testing. There is no dispute that such access was necessary to comply with federal regulations. Mr. Saltaformaggio also testified that he rejected building a road from LA Hwy 1 to the valve site for a variety of reasons, and instead selected a route through property owned by Georgia Gulf and across the tracks owned by Union Pacific, the latter consisting of a 50 feet by 30 feet parcel.
First, he believed that such a road coming from LA Hwy 1 would not meet the wetland requirements of the Corps of Engineers, and he believed that there were wetlands along that route, noting there was standing water up to the knee of his hip]boots14 and the ground was muddy. While ExxonMobil itself did not order a *201 wetlands assessment, a fact Union Pacific cites as indicative of arbitrariness, Union Pacific in advance of trial did commission such a delineation, and wetlands were determined to exist along the so-called alternate route and that they would or could be impacted by the building of a road. Although much of the evidence put on by Union Pacific was to the effect that any wetlands impact could be mitigated and that the Corps of Engineers would possibly approve the building of a road, the fact remains that additional mitigation of wetlands was almost certain to be required in order to build a road from LA Hwy 1, while impacted wetlands along the route selected by ExxonMobil had already been mitigated when the pipeline extension was permitted and constructed. Thus, Mr. Saltaformaggio did not act arbitrarily in citing wetlands delineations as a consideration for not locating the route from LA Hwy. 1.
Furthermore, Mr. Saltaformaggio testified that the access road would necessarily cross two ditches or drainage canals, requiring the building of bridges or other crossings and possibly affecting drainage patterns by the addition of foreign fill consisting of clay and rock. He also testified that the pipeline company does not build roads on top of pipelines, citing safety reasons, and that a road along this route would necessarily involve building the road above ExxonMobil’s pipeline and possibly other companies’ pipelines that traverse that corridor. Although a road can cross a pipeline at a 30-degree angle or more, he explained that the company never builds a road above and parallel to a pipeline because it could exert dangerous loads on the pipe itself and prevent inspection, usually done from the air, for releases of petroleum and damage. No evidence or testimony contradicted his testimony. Indeed, Union Pacific’s civil engineering expert agreed that pipeline companies do not allow the building of roads above their pipelines, and he conceded that, while 115building a road from Hwy 1 was doable, he would probably not recommend that route to ExxonMobil were he consulted by ExxonMobil.
Additionally, Mr. Saltaformaggio testified that physical access from LA Hwy 1 would entail specific safety issues. First, it would require permitting for the building of a driveway off of the highway, which he believed would not be permitted by the Department of Transportation so close to a bridge. He further explained that stopping an 18-wheeler on a busy highway to off-load a 40,000-pound cherry picker at that location would require, at a minimum, closing down the highway for some period of time. He further discounted using as an access Shell Oil Company’s property situated at the highway, citing his concerns that an 18-wheeler assembly could not turn-around on that property and that offloading the cherry picker in that location could present safety issues. Union Pacific presented no evidence that such concerns were unreasonable or arbitrary. Indeed, although Union Pacific’s witness opined that these concerns could be alleviated, no witness testified that they were unreasonable considerations.
Finally, Mr. Saltaformaggio testified that a route from LA Hwy 1 would entail seeking additional servitudes for the building of the road from no less than four property owners, as well as permission from other pipeline owners, to expand its right of way to accommodate a road and corresponding bridges. ExxonMobil’s existing servitudes, which ranged from 10 to 30 feet, were entered in evidence, and support this witness’s testimony. On the other hand, ExxonMobil had already negotiated a servitude for a road along that portion of the new pipeline extension with Georgia Gulf, such that the route selected *202 by ExxonMobil would require seeking a servitude only from Union Pacific. As the district court observed, ExxonMobil’s selected route was “absolutely” more convenient and “probably” less costly.
|1fiOn this record, we find ExxonMobil has established that the private, at-grade crossing over Union Pacific’s rail tracks was for a public and necessary purpose. Additionally, we find that Union Pacific failed to establish that ExxonMobil was arbitrary or capricious in the selection of the route chosen. The record evidence shows that ExxonMobil acted in good faith in both selecting the route ultimately proposed to Union Pacific and in attempting to negotiate an agreement with Union Pacific.[2]
DECREE
For the reasons set forth above, we find in favor of ExxonMobil that it has the right to expropriate a permanent right of way across Union Pacific’s property. Accordingly, we reverse the rulings of the district court and the court of appeal, and remand the matter to the district court for further proceedings involving the determination of any limitations or ancillary rights and the amount of just compensation.
REVERSED AND REMANDED.
KNOLL, J., dissents and assigns reasons.
WEIMER, J., concurs in the result.

 Kimball, Chief Justice, participated in oral argument but did not participate in the deliberation of this opinion.

. La.Rev.Stat. 45:251(1) defines a "common carrier” as including all persons engaged in the transportation of petroleum as public utilities and common carriers for hire; or which on proper showing may be legally held a common carrier from the nature of the business conducted, or from the manner in which such business is carried on. ExxonMobil and Union Pacific stipulated prior to trial that ExxonMobil is a common carrier.

. We also find no merit to Union Pacific’s argument that ExxonMobil must establish a greater public interest in the property given that Union Pacific is also a common carrier. We note that La.Rev.Stat. 45:254 expressly grants common carrier pipelines, such as ExxonMobil, the right to cross railroads, and that this right is not expressly limited to the right to lay pipelines that cross railroads. As the dissenting judge below reasoned, the language in La.Rev.Stat. 45:254, when read in conjunction with La.Rev.Stat. 45:251(3) (which states a "pipe line includes the real estate [and] rights of way ... necessary for the proper conduct of its business ..."), is broad enough to encompass the right of passage or access across a railroad. Additionally, in light of the restrictions on ExxonMobil’s use of the servitude offered during its negotiations with Union Pacific, there is no showing that the servitude will interfere in Union Pacific's operations in any significant manner. As Union Pacific’s witness testified, at present the operations on the spur and runaround track essentially cease during the day, or at least the afternoon, and any additional daytime usage of the tracks in the future remains speculative.