35 So.3d 192 (2010)
EXXONMOBIL PIPELINE COMPANY
v.
UNION PACIFIC RAILROAD COMPANY.
No. 2009-C-1629.
Supreme Court of Louisiana.
March 16, 2010.
Rehearing Denied May 7, 2010.
*193 Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Gary A. Bezet, Gregory Michael Anding, Mark Andrew Marionneaux, Carol Galloway, Baton Rouge, for Applicant.
Phelps Dunbar, LLP, Michael Dale Hunt, Harry Alston Johnson, III, Baton Rouge, for Respondent.
GUIDRY, Justice.[*]
ExxonMobil Pipeline Company (hereinafter, "ExxonMobil") as a common carrier pipeline company seeks to expropriate land belonging to Union Pacific Railroad Company (hereinafter, "Union Pacific") for a private, restricted-access, at-grade surface crossing over Union Pacific's spur track and runaround track in Plaquemine, Louisiana. These tracks are used to service customers Shintech, Air Liquide, and Georgia Gulf. ExxonMobil's reason for the access route is to facilitate performance of maintenance and federally-mandated testing procedures commencing at a valve assembly located within ExxonMobil's right of way on property owned by Georgia Gulf. This valve assembly was part of an extension of ExxonMobil's pipeline to provide ethylene to Shintech. The district court found ExxonMobil failed to show a necessary and public purpose for expropriation of the subject land. The court of appeal majority affirmed. For the reasons set forth below, we reverse the lower courts' rulings, enter judgment in favor of ExxonMobil, and remand the case to the district court for further proceedings.

FACTS AND PROCEDURAL HISTORY
ExxonMobil, as stipulated by the parties, is a common carrier pipe line company with the right to expropriate "private property under the state expropriation *194 laws for use in its common carrier pipe line business...."[1] La.Rev.Stat. 45:254. In 1979, ExxonMobil constructed an ethylene pipeline extending from LA Hwy 1 in Plaquemine, Louisiana, into what is now the Georgia Gulf plant. In 2007, by adding a valve assembly, ExxonMobil constructed an extension of the pipeline into what is now the Shintech plant. The valve assembly is located approximately 2500 feet from LA Hwy 1 on property owned by Georgia Gulf. ExxonMobil employees testified that federal statutes and regulations require monthly inspection of the valve assembly, bi-annual operation of the valves themselves, and a mechanical inspection every five years. This mechanical inspection consists of the placement of a device referred to as a PIG into the line at the valve assembly and then running the PIG to the end of the line. The PIG is placed into the line at the valve assembly with the use of a cherry picker, weighing approximately 40,000 pounds. Additional equipment is used to flare-off the ethylene removed from the valve assembly during insertion of the PIG.
According to testimony at trial, ExxonMobil employees determined that the best access route to the valve assembly would lie from Evergreen Road through Georgia Gulf property, across Georgia Gulf's private outbound track, across Union Pacific's parallel spur and runaround tracks, and along ExxonMobil's right of way for the pipeline extension for about 1000 feet east of the valve site. ExxonMobil's Senior Staff Right of Way and Claims Agent testified that he had immediately ruled out accessing the valve assembly from LA Hwy 1 to the west, because of having to mitigate possible wetland delineations along that route, having to cross or build over other pipelines, having to secure rights of way and additional servitudes from four different property owners, having to build crossings over two ditches, and, most importantly, having to build the road or part of it above its own or another company's pipeline. While a road may cross over a pipeline at a minimum 30-degree angle, the witness explained, the pipeline company does not allow roads to be built alongside and above a pipeline for safety reasons.
ExxonMobil prepared plans, obtained permission for the route from Georgia Gulf crossing its property, and then requested permission from Union Pacific for the 50-by-30-foot section crossing its spur and runaround tracks. ExxonMobil selected the location noting that it appeared there was some build-up at that location allowing informal, if unauthorized, passage over the tracks. At any rate, ExxonMobil employees met at the site with Union Pacific employees, who then rejected the request noting that Union Pacific as a policy matter does not grant new at-grade crossings, even private ones, at least without a corresponding removal of other such crossings. Correspondence ensued, in which ExxonMobil offered inter alia to limit its access to monthly inspections and the mechanical inspection every 5 years, to place a locked gate at the crossing, and to provide sufficient notice to Union Pacific whenever a crossing is to be made. Eventually, ExxonMobil made an offer of money based on its expert's estimated value of the land to be expropriated. Representatives from both companies met again, this time at an attorney's office, but the parties could *195 reach no agreement, with ExxonMobil desiring the at-grade surface crossing and Union Pacific refusing it. Thereafter, ExxonMobil petitioned for expropriation of Union Pacific's property under its authority as a common carrier pipe line company.
Following a bench trial, the district court denied the petition for expropriation. The district court observed that ExxonMobil had to establish that the expropriation is for a public and necessary purpose. The district court further noted that the pipeline had been constructed and was moving product, so that ExxonMobil was required to show a public purpose for the requested servitude across a railroad track to cross the track and inspect its pipeline. Relying on Texas Pipe Line Company v. Stein, 190 So.2d 244 (La.App. 4th Cir. 1966), rev'd on other grounds, 250 La. 1104, 202 So.2d 266 (1967), the district court found the public character of the servitude is determined by the extent of the right to its use by the public. Here, the district court reasoned, ExxonMobil had restricted the right of the public to use the crossing by limiting its use only to ExxonMobil employees. The district court further noted that ExxonMobil had obtained over 9000 feet of servitude for the pipeline extension, along with an additional servitude for a road of 1000 feet. On this reasoning, the district court found ExxonMobil had failed to establish a public and necessary purpose for the servitude across Union Pacific's spur and runaround tracks.
ExxonMobil appealed, and a majority of the court of appeal affirmed the district court's ruling. ExxonMobil Pipeline Company v. Union Pacific Railroad Company, 08-2347 (La.App. 1 Cir. 5/13/09), 15 So.3d 246. The court of appeal majority found that ExxonMobil had failed to establish a public purpose because the right of the public to use the desired servitude had been restricted by ExxonMobil itself. The court of appeal majority observed that, in determining whether a proposed expropriation is for a public purpose, the courts look to the extent of the public's right to its use rather than the number of persons actually using the property at any given time, citing, as did the district court, Texas Pipe Line Company v. Stein, 190 So.2d at 252. The court of appeal majority further noted there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation that may prove beneficial or profitable to some portion of the public, citing Terrebonne Parish Police Jury v. Kelly, 472 So.2d 229, 232 (La.App. 1st Cir.1985), which had cited River & Rail Terminals v. Louisiana Ry. & Nav. Co., 171 La. 223, 130 So. 337, 340 (1930). However, the Court of appeal majority observed, "actual use by the public is not the criteria by which public purpose is determined," citing Texas Pipe Line Company, 190 So.2d at 250. 08-2347, p. 4, 15 So.3d at 248.
Nonetheless, the court of appeal majority reasoned as follows:
In the instant case, ExxonMobil seeks to expropriate a right of way to build an access road solely to enable it to access its pipeline to perform routine maintenance and inspections. ExxonMobil asserts that the pipeline serves a public purpose and that the access road is necessary to maintain that public purpose. However, the record is devoid of any evidence that the right of way and proposed access road itself will serve a public purpose. In fact, the evidence presented at trial suggests that the portion of the access road crossing Union Pacific's property will be a private crossing, with a locked gate that will only be accessible by ExxonMobil. Further, according to the record, the access road will only be used by ExxonMobil to access *196 its pipeline at the valve site to perform routine maintenance and inspections. None of this evidence demonstrates, however, that the public has a general right to a definite use of the property.
08-2347, p. 5, 15 So.3d at 249. The majority concluded that the land sought to be expropriated would not itself be used to protect the safety of the public, but rather, would be used only by ExxonMobil to access its pipeline and right of way to perform statutorily-required maintenance and inspections. Thus, the majority found no error in the district court's finding that ExxonMobil had failed to establish a public and necessary purpose for the expropriation of the right of way and access road servitude across property owned by Union Pacific.
The dissenting judge on the appellate court panel believed that ExxonMobil did not have to prove the public will directly use an access road to establish a public purpose. The dissenting judge reasoned that ExxonMobil did prove a public purpose because it established it needed access to its pipeline to perform inspections and maintenance of the valve site to ensure the integrity and safe operation of the pipeline and safety of the public. It was sufficient to prove public purpose, the dissenting judge further reasoned, that such maintenance of the pipeline is required by federal statute and that the access road is needed to perform these mandated inspections.
On application by ExxonMobil, we granted the writ application to consider the correctness of the rulings below. ExxonMobil Pipeline Company v. Union Pacific Railroad Company, 09-1629 (La.10/30/09), 21 So.3d 269.

DISCUSSION
The issue before this court is whether ExxonMobil has established a public and necessary purpose for expropriation of a servitude across Union Pacific's rail tracks for an access road, which ExxonMobil asserts is necessary to perform statutorily-mandated inspections on its pipeline. As previously noted, ExxonMobil is a common carrier pipeline company as defined in La. Rev.Stat. 45:251. La.Rev.Stat. 45:254 thus grants ExxonMobil with the authority to expropriate private property under certain circumstances. That statute provides, in pertinent part:
All persons included in the definition of common carrier pipe lines as set forth in R.S. 45:251 have the right of expropriation with authority to expropriate private property under the state expropriation laws for use in its common carrier pipe line business, and have the right to lay, maintain and operate pipe lines, together with telegraph and telephone lines necessary and incident to the operation of these pipe lines, over private property thus expropriated, and have the further right to lay, maintain and operate pipe lines along, across, over and under any navigable stream or public highway, street, bridge or other public place, and also have the authority, under the right of expropriation herein conferred, to cross railroads, street railways, and other common carrier pipe lines by expropriating property necessary for the crossing under the expropriation laws of this state.
Article I, Section 4 of the Louisiana Constitution of 1974 addresses the expropriation of private property by a private entity for public purposes:
Property shall not be taken or damaged by a private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner; in such proceedings, whether the purpose is *197 public and necessary shall be a judicial question.
Expropriation laws are special and exceptional in character, in derogation of common rights, and as such, must be strictly construed. United Gas Pipe Line Company v. Blanchard, 149 So.2d 615 (La.App. 1st Cir.), writ denied, 244 La. 135, 150 So.2d 590 (1963).

Public Purpose
ExxonMobil argues that its ethylene pipeline supplies petroleum to Shintech, and that by supplying even one consumer, a plant facility that provides jobs and other benefits to the community, the pipeline serves a public and necessary purpose. ExxonMobil further argues that the access road is necessary to perform federallymandated inspections on the pipeline and that these inspections are intended to protect the safety of the public and ensure the delivery of needed resources to its consumers. Thus, ExxonMobil argues, the access road serves a public and necessary purpose, by allowing ExxonMobile to maintain and inspect its valve site and pipeline.
The lower courts found that the public would be restricted from actual use of the access road itself, and thus the extent of the right of the public to use the access road indicated that it would not serve a public purpose. ExxonMobil argues the lower courts erred in focusing primarily on whether the public would have actual use of the railroad crossing, when the authority granted to ExxonMobil as a common carrier pipeline company is broad enough to include additional real estate to facilitate the maintenance and inspection of its pipeline. Before this court, Union Pacific has downplayed the lower courts' focus on actual public use of the requested crossing; instead, Union Pacific argues the district court did not only find the lack of a public purpose, it also found that the requested crossing was not shown to serve a necessary purpose.
We find the lower courts erred in focusing primarily upon the actual usage of the public of the desired railroad crossing in determining whether the requested servitude would serve a public purpose. While actual public use of the servitude may play a role in the appropriate case in determining whether the expropriation serves a public purpose, we do not read the constitutional provision and the statutes granting ExxonMobil its authority to expropriate private property as restricting expropriating real estate to that on which the pipeline itself is placed, nor do we interpret these provisions and the jurisprudence as requiring direct public use as the sole factor in determining whether the expropriated property will serve a public purpose.
As the court of appeal majority noted, see 08-2347, p. 7 n. 3, 15 So.3d at 250 n. 3, the courts of this state have taken arguably divergent views on finding a public purpose when a proposed expropriation is alleged to serve only a single, private entity, and thus some courts have focused solely upon whether the public would have the right to actual use. For example, in River & Rail Terminals, Inc. v. Louisiana Ry. & Nav. Co., a railroad laid a spur track across the property of the plaintiff to reach the property of an oil refinery company. The plaintiff accused the railroad of illegal and tortious trespass and sought injunctions prohibiting the railroad from using the track and requiring the track's removal. Although not an expropriation action, this court stated that "[t]he outstanding issue in this case is whether the spur track in question is for a private or public purpose." Id., 130 So. at 338. The plaintiff argued that "the spur track was constructed for the private accommodation of both defendant railroad and the oil refinery, *198 and to make the private business of both more profitable." Id. at 339. This court agreed, finding that the public had the right to use neither the refinery's loading station nor the spur track and that the spur track "serves no other enterprise but the [refinery], and ... was constructed solely for the purpose of enabling [the railroad] to handle tank cars shipped out of the refinery." Id. at 340. In so holding, this court stated, "It is well settled that there must be a general public right to a definite use of the property, as distinguished from a use by a private individual or corporation which may prove beneficial or profitable to some portion of the public." Id. at 340.
However, this court later identified the somewhat differing approaches to determining public purpose, quoting Corpus Juris, vol. 20, p. 551 et seq., as follows:
No general definition of what degree of public good will meet the constitutional requirements for a "public use" can be framed, as it is in every case a question of public policy. The meaning of the term is flexible and is not confined to what may constitute a public use at any given time, but in general it may be said to cover a use affecting the public generally, or any number thereof, as distinguished from particular individuals. Some courts ... hold that "public use" is synonymous with "public benefit," "public utility" or "public advantage," and to authorize the exercise of the power of eminent domain to promote such public benefit, etc., especially where the interests involved are of considerable magnitude, and it is sought to use the power in order that the natural resources and advantages of a locality may receive the fullest development in view of the general welfare.... Other courts, however, ... hold[] in effect that "public use" means use by the public.... Under this view it is essential to constitute a public use that the general public have the right to a definite and fixed use of the property appropriated, not as a mere matter of favor or by permission of the owner, but as a matter of right.... The character of the use, and not its extent, determine the question of public use. It is not essential that the use or benefit extend to the whole public or any considerable portion thereof, nor that each and every individual member of the community have the same degree of interest therein; the fact that the use and benefit is limited to the inhabitants of a small locality, or that the number of persons who are expected to avail themselves thereof is small, is immaterial provided it is open to all upon the same terms.
City of New Orleans v. New Orleans Land Co., 173 La. 71, 136 So. 91, 92-93 (1931).
Later jurisprudence from this court and our appellate courts, except for that of the First Circuit, has not followed the arguably more restrictive line set forth in River & Rail Terminals. In Calcasieu & S. Ry. Co. v. Bel, 224 La. 269, 69 So.2d 40, 43 (1953), for example, the plaintiff established that its railroad would serve the public generally and any industries located near its tracks, and that it hoped to move and transport over its line various commodities, including timber, gravel, and cattle. The plaintiff further established that lumber corporations, owners of large tracts of land situated in the vicinity of the proposed rail line, and purchasers of forest products would and could make use of the facilities of this railroad in the shipment of these products. This court in approving the expropriation, reasoned as follows: "It was shown that the railroad will serve the public, and that the public may use and enjoy its facilities; that the construction of the road will be a public advantage and will tend to enlarge the resources, increase *199 the industrial energies, and promote the productive powers of a considerable number of the inhabitants or businesses of a section of this state, and manifestly will contribute to the general welfare and prosperity of the community in which it is located. Consequently the taking is for public purposes and for purposes of public utility, within the meaning of those terms as they are used in the Constitution." Id., 69 So.2d at 42-43.
Another example is Dixie Pipeline Co. v. Barry, 227 So.2d 1 (La.App. 3d Cir. 1969), writ refused, 255 La. 145, 229 So.2d 731 (1970), in which the Third Circuit acknowledged that a proposed pipeline would connect a privately owned plant with the proposed expropriator's pipeline, but nonetheless found a public purpose where the plant produced propane from the raw stream it received from area producers and where "the effect of the pipeline will be to transport large quantities of propane gas from the plant to a large market in several states." Id. at 7. Similarly, in finding a public purpose for a proposed pipeline that connected to a single enterprise in Louisiana Resources v. Greene, 406 So.2d 1360 (La.App. 3d Cir.1981), writ denied, 412 So.2d 84 (La.1982), the Third Circuit held that "[t]he public need not be supplied gas directly from the pipeline for which expropriation is sought for the expropriation to meet the test of public purpose." Id. at 1364. Rather, "[t]he pipeline serves a public purpose merely by placing more natural gas in the stream of commerce." Id. See also Texas Pipe Line Co. v. Stein, 190 So.2d at 250 ("`actual public use' is not the criteria by which public purpose is determined").
Given the long line of cases since River & Rail Terminals, we agree with the Third Circuit that, despite some previous "restrictive language, the Louisiana jurisprudence has not defined `public purpose' so narrowly." Town of Vidalia v. Unopened Succession of Ruffin, 95-580 (La. App. 3 Cir. 10/4/95), 663 So.2d 315, 319 (per then Judge Knoll). "Rather, any allocation to a use resulting in advantages to the public at large will suffice to constitute a public purpose." Id.
Accordingly, applying these precepts to the facts of this case, we find the servitude across Union Pacific's spur and runaround tracks would serve a public purpose. Even if the access road, and the private at-grade crossing that is the subject of this litigation, are not directly or actually used or open to the public at large, the road and the servitude do serve a public purpose in that they permit the pipeline company to maintain and inspect its pipeline, which delivers petroleum products to end users, and which redounds in benefits to the public at large. Indeed, we note the rather circular logic of the court of appeal and district court, in that they both reasoned that ExxonMobil's offer to restrict use of the crossing only to ExxonMobil employees once a month and every five years  to assuage the safety concerns of Union Pacific  was suggestive that the public purpose was not established because the public was not given right of access to the crossing. Even Union Pacific has not made such an argument.

Necessary Purpose
Indeed, Union Pacific's primary challenge to the expropriation proceeding is its claim that ExxonMobil has not separately shown that the at-grade crossing it desires serves a necessary purpose. Union Pacific argues the district court made a factual finding that the desired route sought by ExxonMobil was not necessary, ostensibly because other routes to the valve site were possible. However, we do not interpret the district court's reasoning *200 as a factual finding that the servitude over the rail tracks did not serve a necessary purpose, and to the extent that the district court may have done so, we find the record evidence does not support such a finding.
In challenges to the necessity of a taking, the landowner must prove that the legislatively-authorized expropriator exercised "its large discretion" arbitrarily, capriciously, or in bad faith. Red River Waterway Com'n v. Fredericks, 566 So.2d 79, 83 (La.1990). Whether the expropriator's purpose is public and necessary is a judicial determination that will not be reversed on appeal absent manifest error. Calcasieu-Cameron Hosp. Serv. Dist. v. Fontenot, 628 So.2d 75, 78 (La.App. 3d Cir.1993), writ denied, 94-0168 (La.3/18/94), 634 So.2d 854. In the context of expropriation, "necessary" refers to the necessity of the purpose for the expropriation not the necessity for a specific location. Calcasieu-Cameron Hosp. Serv. Dist., 628 So.2d at 78. Once public necessity is established, the extent and the location of property to be expropriated are within the sound discretion of the expropriation authority and determination of same will not be disturbed by the courts if made in good faith. Id.
The criteria to be considered by the expropriator in determining the location and extent of the property to be expropriated includes factors such as costs, environmental impact, long range area planning, and safety considerations. Red River Waterway Com'n, 566 So.2d at 83 (citing U.S. v. Carmack, 329 U.S. 230, 67 S.Ct. 252, 91 L.Ed. 209 (1946)). The amount of land and the nature of the acreage taken must be reasonably necessary for purpose of the expropriation, but it is not necessary "to show actual, immediate, and impending necessity for the expropriation." City of New Orleans v. Moeglich, 169 La. 1111, 126 So. 675, 677 (1930). The suitability of the property for expropriation is primarily a question of fact on which the judgment of the trial court will not be disturbed unless manifestly erroneous. Board of Com'rs of New Orleans Exhibition Hall v. Missouri Pacific R. Co., 625 So.2d 1070, 1073 (La.App. 4th Cir.1993), writ denied, 93-3088, 93-3100 (La.1/28/94), 630 So.2d 802. By statute, expropriation of property for common carrier pipe line purposes may include "the real estate, rights of way, pipe in line, telephone and telegraph lines or other communication systems, tank facilities ... necessary for the proper conduct of its business as a common carrier, all fixtures, equipment and personal property of every kind owned, controlled, operated, used or managed, in connection with, or to facilitate the transportation, distribution and delivery of petroleum through lines constructed of pipe." La.Rev.Stat. 45:251(3) (emphasis supplied).
In this case, ExxonMobil's Senior Staff Right of Way and Claims Agent, Paul Saltaformaggio, testified regarding the necessity of periodic access to the valve assembly for federally-mandated inspection and testing. There is no dispute that such access was necessary to comply with federal regulations. Mr. Saltaformaggio also testified that he rejected building a road from LA Hwy 1 to the valve site for a variety of reasons, and instead selected a route through property owned by Georgia Gulf and across the tracks owned by Union Pacific, the latter consisting of a 50 feet by 30 feet parcel.
First, he believed that such a road coming from LA Hwy 1 would not meet the wetland requirements of the Corps of Engineers, and he believed that there were wetlands along that route, noting there was standing water up to the knee of his hip-boots and the ground was muddy. While ExxonMobil itself did not order a *201 wetlands assessment, a fact Union Pacific cites as indicative of arbitrariness, Union Pacific in advance of trial did commission such a delineation, and wetlands were determined to exist along the so-called alternate route and that they would or could be impacted by the building of a road. Although much of the evidence put on by Union Pacific was to the effect that any wetlands impact could be mitigated and that the Corps of Engineers would possibly approve the building of a road, the fact remains that additional mitigation of wetlands was almost certain to be required in order to build a road from LA Hwy 1, while impacted wetlands along the route selected by ExxonMobil had already been mitigated when the pipeline extension was permitted and constructed. Thus, Mr. Saltaformaggio did not act arbitrarily in citing wetlands delineations as a consideration for not locating the route from LA Hwy 1.
Furthermore, Mr. Saltaformaggio testified that the access road would necessarily cross two ditches or drainage canals, requiring the building of bridges or other crossings and possibly affecting drainage patterns by the addition of foreign fill consisting of clay and rock. He also testified that the pipeline company does not build roads on top of pipelines, citing safety reasons, and that a road along this route would necessarily involve building the road above ExxonMobil's pipeline and possibly other companies' pipelines that traverse that corridor. Although a road can cross a pipeline at a 30-degree angle or more, he explained that the company never builds a road above and parallel to a pipeline because it could exert dangerous loads on the pipe itself and prevent inspection, usually done from the air, for releases of petroleum and damage. No evidence or testimony contradicted his testimony. Indeed, Union Pacific's civil engineering expert agreed that pipeline companies do not allow the building of roads above their pipelines, and he conceded that, while building a road from Hwy 1 was doable, he would probably not recommend that route to ExxonMobil were he consulted by ExxonMobil.
Additionally, Mr. Saltaformaggio testified that physical access from LA Hwy 1 would entail specific safety issues. First, it would require permitting for the building of a driveway off of the highway, which he believed would not be permitted by the Department of Transportation so close to a bridge. He further explained that stopping an 18-wheeler on a busy highway to off-load a 40,000-pound cherry picker at that location would require, at a minimum, closing down the highway for some period of time. He further discounted using as an access Shell Oil Company's property situated at the highway, citing his concerns that an 18-wheeler assembly could not turn-around on that property and that off-loading the cherry picker in that location could present safety issues. Union Pacific presented no evidence that such concerns were unreasonable or arbitrary. Indeed, although Union Pacific's witness opined that these concerns could be alleviated, no witness testified that they were unreasonable considerations.
Finally, Mr. Saltaformaggio testified that a route from LA Hwy 1 would entail seeking additional servitudes for the building of the road from no less than four property owners, as well as permission from other pipeline owners, to expand its right of way to accommodate a road and corresponding bridges. ExxonMobil's existing servitudes, which ranged from 10 to 30 feet, were entered in evidence, and support this witness's testimony. On the other hand, ExxonMobil had already negotiated a servitude for a road along that portion of the new pipeline extension with Georgia Gulf, such that the route selected *202 by ExxonMobil would require seeking a servitude only from Union Pacific. As the district court observed, ExxonMobil's selected route was "absolutely" more convenient and "probably" less costly.
On this record, we find ExxonMobil has established that the private, at-grade crossing over Union Pacific's rail tracks was for a public and necessary purpose. Additionally, we find that Union Pacific failed to establish that ExxonMobil was arbitrary or capricious in the selection of the route chosen. The record evidence shows that ExxonMobil acted in good faith in both selecting the route ultimately proposed to Union Pacific and in attempting to negotiate an agreement with Union Pacific.[2]

DECREE
For the reasons set forth above, we find in favor of ExxonMobil that it has the right to expropriate a permanent right of way across Union Pacific's property. Accordingly, we reverse the rulings of the district court and the court of appeal, and remand the matter to the district court for further proceedings involving the determination of any limitations or ancillary rights and the amount of just compensation.
REVERSED AND REMANDED.
KNOLL, J., dissents and assigns reasons.
WEIMER, J., concurs in the result.
KNOLL, Justice, dissenting.
Although I agree with the majority a public and necessary purpose does exist for access to the Shintech valve site for compliance with federal maintenance and inspection regulations, I believe the majority's expropriation analysis, though based solidly on this Court's jurisprudence, is flawed in its blatant and utter disregard for the clear and unambiguous statutory language mandating not only a public and necessary purpose, but also the proposed property be needed and necessary for the expropriation. For the following reasons, I respectfully dissent.
Under our constitution, "[e]very person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property," which right is subject to reasonable statutory restrictions and the reasonable exercise of the police power. La. Const. art. I, § 4(A). The constitution guarantees "[p]roperty shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner." La. Const. art. I, § 4(B)(4)(emphasis added).
By statutory law, a common carrier pipeline company, such as ExxonMobil in the present case, is authorized to "expropriate needed property" when a price cannot *203 be agreed upon with the owner. La. Rev.Stat. § 19:2(8) (emphasis added). Our law specifically allows:
All persons included in the definition of common carrier pipe lines[1] as set forth in R.S. 45:251 have the right of expropriation with authority to expropriate private property under the state expropriation laws for use in its common carrier pipe line business, and have the right to lay, maintain and operate pipe lines, together with telegraph and telephone lines necessary and incident to the operation of these pipe lines, over private property thus expropriated, and have the further right to lay, maintain and operate pipe lines along, across, over and under any navigable stream or public highway, street, bridge or other public place, and also have the authority, under the right of expropriation herein conferred, to cross railroads, street railways, and other common carrier pipe lines by expropriating property necessary for the crossing under the expropriation laws of this state.
La.Rev.Stat. § 45:254 (emphasis added). By the clear and unambiguous language of this statutory law the property to be expropriated must be both needed and necessary, and the party upon whom the burden to establish both the need and necessity of the property should logically be the expropriator.
The majority and this Court's jurisprudence, however, erroneously relieve the expropriator of this burden, transferring it to the landowner, whose constitutional right to undisturbed ownership of property is divested, and, more significantly, expanding the privilege conferred by statutory law. As the law now stands, all the expropriator must prove is a public need in the expropriation by a preponderance of the evidence. Recreation and Park Commission for Parish of East Baton Rouge v. C & S Development, Inc., 97-2652, p. 3 (La.7/8/98), 714 So.2d 706, 707 (Knoll, J., not on panel). The extent and location of the property to be expropriated are within the sound discretion of the body possessing the power of eminent domain, and these determinations will not be interfered with by the courts if made in good faith. Greater Baton Rouge Port Commission v. Watson, 224 La. 136, 140, 68 So.2d 901, 902 (1953). "Once the expropriating agency has met its burden with regard to public need, the burden shifts to the defendant to show that the agency has abused its discretion in selecting the site to be expropriated." Recreation and Park Comm., 97-2652 at p. 3, 714 So.2d at 707. The landowner must prove an abuse of discretion by showing the expropriator acted in bad faith, without adequate determining principles or without reason, or by demonstrating the agency acted without considering and weighing the relevant criteria, namely, the availability of alternate routes, costs, environmental factors, long-range area planning, and safety considerations. Id.
In my opinion, this analysis is wrong and does not reflect a proper balance of the landowner's constitutional right to property with a common carrier pipeline's statutory authority to expropriate property. Moreover, this analysis does not comport with the strict construction of these relevant statutory provisions required by law given "the power of expropriation is in derogation of the fundamental right of free and unmolested ownership of property and that an owner, divested of property rights by expropriation, should be afforded every *204 opportunity to protect his interest therein consistent with law and equity." Central Louisiana Electric Co., Inc. v. Covington & St. Tammany Land & Improvement Co., 131 So.2d 369, 373 (La.App. 1st Cir. 1961). In light of the derogatory nature of expropriation, the burden should never shift from the expropriator to the landowner until the expropriator has demonstrated it acted in good faith, with adequate determining principles, and with reason, which can be established by proving its selection was guided by the relevant criteria. Significantly, in my view, these criteria should be considered from both the prospective of the expropriator as well as the landowner, whose property is subject to the expropriation.
In the present case, ExxonMobil seeks to expropriate Union Pacific's property to place two at-grade crossings over Union Pacific's tracks for the completion of a road to access, inspect, and maintain its Shintech valve site. Federal regulations require bi-yearly inspections and a mechanical inspection every five years. Monthly inspections are performed in compliance with ExxonMobil's own internal policies. At trial, it was revealed both the monthly inspections and bi-yearly inspections have been performed by ExxonMobil employees, who merely walk to the site with the necessary hand tools required to perform the inspections. The inspection every five years would require the dropping of a PIG into the valve, which process takes about two hours. The delivery of the PIG would require a cherry picker, which weighs about 40,000 pounds and is transported by eighteen wheeler, as well as a flare trailer.
At trial, two routes of access to the site were proposed. The route east of the valve site (desired route), which would need to cross the Union Pacific track, was selected by ExxonMobil's Senior Right-of-way and Claims agent, Paul Saltaformaggio, and was about 1200 feet in distance. The alternate LA 1 route, proposed by Union Pacific, would allow access to the valve site through ExxonMobil's existing servitudes from LA 1 and was about 2500 feet in distance.
Admittedly, Saltaformaggio testified he took into account the relevant criteria in determining the best route for the access road:
Okay. Well, when I looked at whether it was possible to come off of LA 1 I quickly discounted that because there's an existing Shell valve station up there that would require access to be right on top of two pipelines. LIG's pipeline is approximately five feet off of our pipeline. Louisiana Interstate Gas has a pipeline there. There's no driveway that actually puts you perpendicular to LA 1. I felt like that that's a fairly hazardous way to access your right-of-way is off of a busy intersection that you'd have with LA 1 with the railroad being there and a bridge embankment there. You'd have to actually stop on the highway to get your equipment, truck, trailer with a big piece of equipment off of it. So I just discounted coming off of there. I looked if there was any other roads from, that you could come off of LA 1 that existed that would intersect into the right-of-way at different locations. I looked at habitat. I knew from looking at a prior delineated wetland's report on the Shintech end that the habitat was very similar. And that because I had been involved with permitting for twenty-something-years I didn't see much differential between the habitat toward LA 1 versus going back toward the Shintech plant. So to me, it was gonna be more of an impact to the wetlands; there were numerous utilities; you can't put a road directly on top of a *205 pipeline, that's an industry standard that we don't do, it's not a safe practice. And so, therefore, after I looked and eliminated any roads that would've came off of some other way to get into the right-of-way there close to where our pipeline tie-in was I came in through Georgia Gulf, I came in through Air Liquide and when I got up to this location right here (indicating) at this crossing, this spur crossing there there is a culvert on this side and there's a culvert on this side where people have used that as a road across that spur track.
However, a review of the trial testimony in its entirety reveals Saltaformaggio merely paid lip service to the relevant criteria and made his determination based on his observations after "walking the routes," the appearance of an informal crossing, and his previous interactions with Union Pacific. As demonstrated through discovery, there were no reports, documents, or emails regarding the selection of this route. Consequently, we are left with merely his testimony regarding his "beliefs" concerning the various factors, which does not establish ExxonMobil's selection was made in good faith, with adequate determining principles, and with reason or was guided by the essential criteria.
Although concerned with the "impact" on wetlands, i.e., the environmental factor, Saltaformaggio testified he did not procure a wetlands delineation. Notably, Union Pacific's expert in wetland delineation, Scott Nesbit, testified even though the desired route was over a thousand feet shorter, there was no environmental advantage to having a route east or west of the valve site, as the impact would be insignificant either way.
As to safety, Saltaformaggio expressed concerns about the LA 1 route with the placement of the road on or next to its pipelines, particularly regarding the undue weight on the pipeline buried about three and half feet deep, with the congestion of utilities, with the two ditches along the route, and with the use of LA 1. However, he did not and admittedly could not even consider the safety implications to Union Pacific and its railway track because he did not know what services Union Pacific provided to Georgia Gulf and Air Liquide, its two online customers at the time of trial. These services actually entail the daily transporting of hazardous materials, specifically, "vinyl chloride monomer, phenol, caustic, and in some cases chlorine," by two trains manned by two crews. Paul Rathgeber, Union Pacific's industry and public project manager, testified in detail regarding the safety issues from the railroad's perspective and past experiences with ExxonMobil at these types of at-grade crossing:
We had one in Beaumont, Texas actually with ExxonMobil that was suppose to be a temporary used crossing, it has requirements in the agreement that we agreed to that required that it have a locking gate that remains locked except during the use, which is the specific vehicle traveling over, and that they have their own flag person present to ensure safe movement across the track and that they maintain vegetation for a sufficient distance. They have never locked that gate; they never maintained the vegetation, and they never had a flagman until they had a fatality at the crossing when it was not supposed to be used. And they then went out and maintained the vegetation and had a flagman for a couple of months, which has gone away and they still refuse to lock the gate.
He also discussed the national policy trying to restrict or reduce at-grade crossings.
*206 Notably, the desired route would cross two other pipelines, the permission for which crossings ExxonMobil had not obtained prior to trial. Utilities run on both sides of the valve site. Moreover, Union Pacific's civil engineer, Ronald Ferris, testified he knew of no engineering practice or standard that prohibits the construction of the desired road over buried pipelines. As to the specific weight concerns of the alternate LA 1 route, according to Saltaformaggio, a "Pieces report," which factors in wall thickness, depth of cover, age of pipe, grade of pipe, amount of fill, and amount of limestone, could have been conducted for weight determinations and would need to be done to obtain permission from the other pipeline companies for the crossing of their pipelines on the desired route. However, no such report had been done prior to trial. Interestingly, Rathgeber testified locomotives weighing over 400,000 pounds and tank cars weighing around 300,000 pounds are allowed to cross pipeline for a flammable commodity buried at a depth of 4½ feet below the bottom of the rail.
Additionally, regarding the use of LA 1 for the unloading of the cherry picker every five years, there was trial testimony the railroad has successfully unloaded comparable equipment onto LA 1 with a temporary permit to block traffic under the direction of the State Police. Saltaformaggio's testimony also seemed to imply the use of State Police in emergency situations.
Likewise, Saltaformaggio could not have taken into consideration the long-range area planning of the railroad, which was about to begin servicing Shintech and was engaged in a remodeling and refabrication of its track for this purpose. Saltaformaggio also could not testify regarding the cost of the alternate route, a route he did not even consider, because he did not speak with ExxonMobil's servitude providers regarding the expansion of its servitudes, he did not meet with any engineers to discuss the possibility of building bridges over or culverts in the ditches, he did not procure a wetlands delineation, he did not order a Pieces report, and he did not meet with anyone regarding the procurement of a servitude off of LA 1 or the use of Shell's driveway. He most definitely could not testify to the cost implications for the railroad due to the interruption of its services and issues with car storage.
Saltaformaggio did, however, make a determination the desired route was the most convenient, but convenience is not the appropriate standard. In my opinion, ExxonMobil did not demonstrate by a preponderance of evidence the need or necessity of the crossing or the desired route was selected based on adequate determining principles or criteria considered from both sides of the expropriation.
Regardless, the necessity of the expropriated property should be considered a factual determination, just like the determination of the suitability of the proposed property. Greater Baton Rouge Port Comm., 224 La. at 141, 68 So.2d at 902 ("the suitability of the property sought to be expropriated for the purpose as stated is primarily a question of fact"). As a finding of fact, this determination should not be disturbed unless manifestly erroneous.
In the present case, the district court clearly found the property sought as well as the desired route were not necessary because "Exxon has a servitude and every servitude I read the right to construct, maintain, inspect, operate, protect, replace, repair, everyone of your servitude's has that. And you're saying I want another servitude to go inspect it and repair it and maintain it. You had one. You got the whole length of it. You even got a[new] *207 one which is even wider than the other one."
In his reasoning, the district court was particularly interested in ExxonMobil's federally mandated obligation to maintain and repair its existing pipeline, an obligation ExxonMobil has had for the last twenty-eight years and the performance of which could entail the need for and use of heavy machinery or equipment equivalent to or greater in weight than the 40,000 pound cherry picker needed for the PIG. The District Court focused intently upon the fact ExxonMobil has been able to meet this obligation and remain in compliance with federal regulations for the past twenty-eight years, asking Saltaformaggio: "Before you ever built this valve site, for this existing eight-inch ethylene line for the last twenty-eight years you have had and retained an obligation to be able to get whatever equipment is necessary to repair that line to that location, is that not correct?" To this Saltaformaggio replied: "We've had an obligation to be able to, if there's an event out there, to be able to go out there and make a repair, that's correct."
The district court specifically questioned ExxonMobil's ability to repair its pipeline in cases of emergency with the assistance of the State Police in getting access and equipment to the site. He apparently reasoned the servicing of the valve every five years for a two-hour period of time could be accomplished in a manner comparable to the servicing of the line in an emergency. In light of this reasoning, the district court did not find ExxonMobil demonstrated the need or necessity of the desired crossing or route. The district court clearly concluded the authority and ability ExxonMobil had to have as required by federal regulation under its existing servitudes to service its pipelines in an emergency and for maintenance and repair purposes necessarily encompassed the authority and ability to service the valve site every five years.
In conclusion, with all due respect I find I must dissent from my Brethren. Rather than affirm, we should use this case to correct the erroneous interpretation that has crept into our jurisprudence through the years of improperly shifting the burden on the landowner to show the common carrier has not established a need and necessity; this burden clearly rests with the one requesting the expropriation. With this opinion, the majority now blesses this erroneous interpretation, and in my view, lowers the bar for the taking of one's property for the sake of convenience.
Moreover, I find the majority clearly fails to demonstrate the trial court committed manifest error given the factual basis supported by the record for its findings. The record easily demonstrates a reasonable basis for the trial court's ruling and its ruling was not clearly wrong.
NOTES
[*] Kimball, Chief Justice, participated in oral argument but did not participate in the deliberation of this opinion.
[1] La.Rev.Stat. 45:251(1) defines a "common carrier" as including all persons engaged in the transportation of petroleum as public utilities and common carriers for hire; or which on proper showing may be legally held a common carrier from the nature of the business conducted, or from the manner in which such business is carried on. ExxonMobil and Union Pacific stipulated prior to trial that ExxonMobil is a common carrier.
[2] We also find no merit to Union Pacific's argument that ExxonMobil must establish a greater public interest in the property given that Union Pacific is also a common carrier. We note that La.Rev.Stat. 45:254 expressly grants common carrier pipelines, such as ExxonMobil, the right to cross railroads, and that this right is not expressly limited to the right to lay pipelines that cross railroads. As the dissenting judge below reasoned, the language in La.Rev.Stat. 45:254, when read in conjunction with La.Rev.Stat. 45:251(3) (which states a "pipe line includes the real estate [and] rights of way . . . necessary for the proper conduct of its business. . ."), is broad enough to encompass the right of passage or access across a railroad. Additionally, in light of the restrictions on ExxonMobil's use of the servitude offered during its negotiations with Union Pacific, there is no showing that the servitude will interfere in Union Pacific's operations in any significant manner. As Union Pacific's witness testified, at present the operations on the spur and runaround track essentially cease during the day, or at least the afternoon, and any additional daytime usage of the tracks in the future remains speculative.
[1] Throughout Chapter 5 of Title 45 of Louisiana Revised Statutes, the term pipeline is spelled "pipe line."